[Cite as *State v. Pheanis*, 2015-Ohio-5015.]

### IN THE COURT OF APPEALS OF OHIO
### SECOND APPELLATE DISTRICT
### MONTGOMERY COUNTY

|  |  |  |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| *Plaintiff-Appellee* | : | Appellate Case No. 26560 |
| | : | |
| v. | : | Trial Court Case No. 2014-CR-1367 |
| | : | |
| MARK A. PHEANIS | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| *Defendant-Appellant* | : | |
| | : | |

. . . . . . . . . . .

### O P I N I O N

Rendered on the 4th day of December, 2015.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by DYLAN SMEARCHECK, Atty. Reg. No. 0085249, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
      Attorney for Plaintiff-Appellee

MARK A. DEYOUNG, Atty. Reg. No. 0090903, 224 Reading Road, Mason, Ohio 45040
      Attorney for Defendant-Appellant

. . . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Defendant-appellant, Mark A. Pheanis, appeals from his conviction in the Montgomery County Court of Common Pleas after a jury found him guilty of multiple counts of rape and sexual battery of his minor daughter. Specifically, Pheanis challenges the trial court's decision to allow the State to amend six counts in the indictment to change the county in which those six counts occurred. Pheanis also claims his conviction is against the manifest weight of the evidence. For the reasons outlined below, the judgment of the trial court will be affirmed.

**Facts and Course of Proceedings**

{¶ 2} On August 29, 2014, the Montgomery County Grand Jury returned an indictment charging Pheanis with three counts of rape of a minor under the age of 13 in violation of R.C. 2907.02(A)(1)(b), with the first two counts including a specification that the victim was under the age of 10. Pheanis was also charged with three counts of rape by force or threat of force in violation of R.C. 2907.02(A)(2), as well as six counts of sexual battery in violation of R.C. 2907.03(A)(5). The charges stemmed from allegations that Pheanis sexually abused his minor daughter, L., on various occasions between November 9, 2003 and January 1, 2013. Pheanis pled not guilty to the charges and the matter proceeded to a jury trial beginning on December 15, 2014.

{¶ 3} On the first day of trial, Pheanis challenged venue in Montgomery County for six of the twelve counts alleged in the indictment, claiming that the discovery he received from the State indicated that four of the counts occurred in Greene County with another two in Pike County. The State agreed that the six counts at issue occurred in Greene

and Pike Counties, but contended that under R.C. 2901.12(H), Montgomery County was a proper venue for all twelve counts given that each count occurred as part of a course of criminal conduct. After considering both parties' arguments, the trial court permitted the State to amend the six counts in the indictment to allege that they occurred in Greene and Pike Counties, respectively, as opposed to Montgomery County. Pheanis's counsel thereafter advised the court that he was prepared to go forward with trial despite the recent amendment to the indictment.

{¶ 4} It is undisputed that between February 2004 and September 2006, L. lived with her mother, siblings, and Pheanis at a residence in Greene County, Ohio. During this time, L. was between five and seven years old. It is also undisputed that in September 2006, L. and her family moved to a residence in Montgomery County, Ohio. In addition, it is undisputed that L. and her family went on a camping trip to her great aunt's property in Pike County, Ohio, in September 2008, when L. was nine years old and in the fourth grade.

{¶ 5} At trial, L. testified regarding six specific incidents of sexual abuse involving Pheanis. L. testified that the first two incidents occurred in a toy room at her former residence in Greene County, the third incident occurred in the woods when she went on the camping trip in Pike County, Ohio and the final three incidents occurred in the basement, living room, and front porch of the Montgomery County residence. L. also testified that there were other instances of abuse beyond the six that she described; however, she explained that she was too embarrassed to discuss the other incidents because of what Pheanis made her say and do.

*Greene County – First Incident in Toy Room*

**{¶ 6}** When describing the first incident in Greene County, L. testified that she was at home and upset because her mother took her older brother to the store and left her behind with her other siblings and Pheanis. L. testified that Pheanis became angry with her because she would not stop crying. L. claimed that in response to her crying, Pheanis took her upstairs into a bedroom that they had used as a toy room. L. testified that Pheanis then shut the door to the toy room, took his belt off, and told her to pull down her pants and underwear and lean over the bed. L. testified that Pheanis had previously spanked her bare bottom before, but this time she felt his hands on her hips and the worst pain in her bottom. During this time, L. testified that Pheanis's penis touched her bottom and that she felt pain "up inside [her] body." Trial Trans. Vol. II (Dec. 16, 2014), p. 319. She also testified that Pheanis was moving his hips back and forth. L. claimed that she did not understand what was happening at the time, but now realizes Pheanis was "messing with [her] sexually." *Id.* at 320. L. testified that after Pheanis was finished, he said that if she kept crying he would do it to her again. Following that incident, L. recalled being constipated.

*Greene County – Second Incident in Toy Room*

**{¶ 7}** When describing the second incident in Greene County, L. testified that one evening while she was eating dinner she hid a piece of sausage in her pants due to a dislike for meat. L. testified that she and Pheanis had previously made a deal that if she did not eat her sausage he would spank her with a wooden paddle. On this specific occasion, L. chose to endure a spanking over eating her sausage. L. testified that

Pheanis carried her upstairs to the toy room, shut the door, and like the first incident, he had her pull down her pants and underwear and bend over the bed. However, on this occasion, L. testified that Pheanis did not take off his belt. L. testified that Pheanis then did the same thing to her as before, claiming his penis touched the inside of her bottom and that it was very painful. L. also recalled Pheanis moving his hips again and putting his hands on her hips. L. testified that at the time, she realized Pheanis was not spanking her, but she still did not understand what was happening. Similar to the first incident, L. testified that she now understands that Pheanis was once again "messing with [her] sexually." *Id.* at 326.

### *Camping Trip Incident*

**{¶ 8}** L. testified that in the fourth grade she went on a camping trip with her family to her great aunt's house in Pike County, Ohio. L. recalled that the property had a lot of woods and a creek where she and her family went on nature walks. L. testified that on one occasion she and Pheanis went on a nature walk alone together. During the walk, she and Pheanis stopped at the creek in the woods, because Pheanis thought it was beautiful and wanted to pray there. L. testified that Pheanis told her to come closer so she could look at the creek. Upon coming closer, L. testified that Pheanis tripped her with his foot, which caused her to fall to the ground. After she fell, L. testified that she looked up and saw "that look in his eyes," which L. described as a "really scary" look when he got mad or was going to be violent. *Id.* at 332. L. claimed that she tried to crawl away, but Pheanis stopped her beside the creek, pulled off her pants and underwear, got on top of her while she was on her stomach, put his hands on her shoulders, and put his

penis inside her vagina. L. recalled this being very painful, but did not recall Pheanis ejaculating.

{¶ 9} L. then testified that when Pheanis was finished he used her underwear as a rag to clean himself off because he had blood on him from her vagina. Thereafter, L. saw Pheanis throw her underwear into the creek. L. further testified that Pheanis said if she told anyone about what happened he would do it to her again. L. and Pheanis then walked back to the house and took a bath together because they had mites on their bodies from the woods. L. recalled that during the bath, Pheanis took off her underwear again and put them in his pocket because they had blood in them. L.'s mother also testified at trial and recalled L. going on a nature walk alone with Pheanis during the camping trip, as well as Pheanis taking a bath with L.

*Montgomery County – Basement Incident*

{¶ 10} L. testified that in the fifth or sixth grade her friend M. came over to the Montgomery County residence to spend the night. L. claimed that she became angry at Pheanis that day because he told her that he was going to send M. home. L. testified that while everyone else was upstairs, she and Pheanis argued with each other on the stairs leading to the second floor of the house. L. claimed that she then angrily went down to the basement and sat on a desk. According to L., Pheanis followed her to the basement and had the scary look in his eyes. L. testified that Pheanis then pulled her off the desk and shoved her head into the arm of a blue recliner so hard that she developed a knot on her head. L. claimed that Pheanis had her bent over the arm of the chair when he pulled down her pants and underwear, unzipped his jeans, and put his

penis inside her vagina while holding her head with his hand. L. claimed that she was screaming and crying for her mother while Pheanis was doing this. L. testified that her mother and M. came partially down the basement stairs, but Pheanis made it look as though he was just spanking her, as the back of the recliner was facing her mother. L. said her mother looked at her as if she was crying and carrying on for no reason and then went back upstairs with M. After her mother went upstairs, L. felt Pheanis put his penis back in her vagina and ejaculate inside her body. L. claims she did not tell anyone about the incident in the basement because Pheanis threatened he would do it again if she did.

**{¶ 11}** L.'s mother testified that she recalled the spanking incident in the basement. Specifically, L.'s mother remembered going partially down the basement stairs and seeing L. bent over the arm of the recliner with her pants down and Pheanis behind her. She claimed that she then went back upstairs because she did not want to see L. get spanked. L.'s mother further testified that she thought it was odd that Pheanis was spanking L. in the basement, but never suspected anything was amiss.

*Montgomery County – Living Room Incident*

**{¶ 12}** L. testified that the second incident at the Montgomery County residence occurred around Christmas after her parents were separated. It is undisputed that Pheanis and L.'s mother separated in April 2011, and divorced in October 2012. They initially separated after Children Services required Pheanis to leave the home for a period of time following an incident where Pheanis punched L.'s older brother. After that incident, Pheanis stayed at either his sister's residence in Middletown, Ohio, or the Montgomery County residence. Although Pheanis no longer resided at the Montgomery

County residence full time, it is undisputed that Pheanis would often stay at the residence even after the divorce.

{¶ 13} It was during the initial period of separation that L. recalled Pheanis visiting the home and yelling at her for not getting off the computer. L. recalled that she was downloading music onto her iPod when her sister wanted to use the computer. When Pheanis told her to get off the computer, L. got mad and yelled at him. L. testified that she then went to her mother's room and Pheanis followed her and demanded that she give him her iPod. In response, L. testified that she screamed that she hated him, that he was not supposed to be there, and that he should leave. That night, L. recalled sleeping downstairs on the loveseat because her stomach was upset. L. testified that she woke up in the middle of the night to Pheanis pulling her off the loveseat and down to the floor while everyone else was upstairs sleeping. L. claimed that Pheanis duct taped her mouth, pulled her underwear off under her nightgown, and put his penis inside her vagina while on the living room floor. According to L., she did not resist because she was tired and not thinking clearly.

*Montgomery County – Front Porch Incident*

{¶ 14} L. testified that at some point in time she moved out of her upstairs bedroom in the Montgomery County residence and created a bedroom for herself on the residence's enclosed front porch. L. testified that the last time Pheanis abused her she was sleeping in her bed on the front porch in late December 2012, when she was in the eighth grade. Specifically, L. testified that she woke up in the middle of the night and saw Pheanis entering the porch while he was wearing his work clothes. L. testified that

she curled into a ball because she knew what was going to happen next. She claimed that she then tried to fight Pheanis off, but she did not scream because she was scared and not thinking clearly. Thereafter, L. testified that Pheanis duct taped her mouth, as well as her hands to a bed rail above her head. She claimed Pheanis then pulled off her pajama pants and underwear, put his penis inside of her vagina, and ejaculated inside her body. L. testified that after Pheanis finished, he removed the duct tape from her hands and left for work. Before leaving, L. claimed that Pheanis threatened to kill her family if she told anyone what had happened. L. testified that after Pheanis left, she cried and cut herself on the arms, which she had been doing since the sixth grade.

{¶ 15} Continuing, L. testified that following the incident on the front porch, she thought she was pregnant because her period was late. L. claimed that she told Pheanis that she thought she was pregnant from the last incident and that he took her to Walmart to buy her a pregnancy test. According to L., Pheanis made her take the pregnancy test in Walmart's restroom. L. claims that she gave Pheanis the test after she was finished, but he never told her the results. L. testified that a few nights later, she woke up to Pheanis punching her in the middle and lower abdomen with a closed fist. L. claimed she started her period a week later.

{¶ 16} L. further testified that she told her therapist, Janice Mautz, about the last incident during a therapy session by handing Mautz a written note. After Mautz read the note, L. recalled Mautz telling her that she was going to have to call the police and Children Services. Mautz testified at trial and confirmed L.'s testimony regarding the note. Specifically, Mautz testified that on November 19, 2013, L. handed her a note that said: "The last time my dad ever did anything to me, he got me pregnant. I went to him

instead of my mom. He punched my stomach—he punched my stomach as hard as he could multiple times. A week later, I started my monthly." Trial Trans. Vol. I (Dec. 15, 2014), p. 234; State's Exhibit 1. Following this disclosure, the police began an investigation that led to the twelve charges being brought against Pheanis.

{¶ 17} After the State rested, Pheanis moved for dismissal under Crim.R. 29, which the trial court overruled. Pheanis then testified in his defense and denied ever sexually abusing L. Following the presentation of evidence, the jury deliberated and found Pheanis guilty of all twelve counts alleged in the indictment, as well as the corresponding specifications. The trial court then sentenced Pheanis to an aggregate term of 40 years to life in prison and designated him a Tier III sex offender.

{¶ 18} Pheanis now appeals from his conviction, raising two assignments of error for review.

**First Assignment of Error**

{¶ 19} Pheanis's First Assignment of Error is as follows:

THE TRIAL COURT ERRED BY GRANTING APPELLEE'S MOTION TO AMEND THE INDICTMENT.

{¶ 20} Under his First Assignment of Error, Pheanis contends the trial court erred in allowing the State to amend six counts in the indictment to change the county in which those specific offenses occurred. Specifically, the trial court permitted the State to amend Counts 1, 2, 6, and 7 of the indictment to allege that those offenses (rape of a minor under the age of 10 and sexual battery) occurred in Greene County as opposed to Montgomery County. The trial court also permitted the State to amend Counts 3 and 8

to allege that the offenses under those counts (rape of a minor under the age of 13 and sexually battery) occurred in Pike County as opposed to Montgomery County. Pheanis challenges the amendment on grounds that it was not made until the day of trial and claims that the amended counts should have been dismissed for improper venue. We disagree.

{¶ 21} The amendment of an indictment is governed by Crim.R. 7(D), which provides, in pertinent part:

> The court may at any time before, during, or after a trial amend the indictment * * * in respect to any defect, imperfection, or omission in form or substance, or of any variance with the evidence, provided no change is made in the name or identity of the crime charged. If any amendment is made to the substance of the indictment, * * * or to cure a variance between the indictment, * * * and the proof, the defendant is entitled to a discharge of the jury on the defendant's motion, if a jury has been impaneled, and to a reasonable continuance, unless it appears from the whole proceedings that the defendant has not been misled or prejudiced by the defect or variance in respect to which the amendment is made, or that the defendant's rights will be fully protected by proceeding with the trial, or by a postponement thereof to a later day with the same or another jury.* * *

{¶ 22} It is well established that "[a]n amendment that changes the name or identity of the offense charged constitutes reversible error, regardless of whether the defendant can show prejudice." (Citation omitted.) *State v. Honeycutt*, 2d Dist. Montgomery No. 19004, 2002 WL 1438648, *3 (July 5, 2002). "For amendments that do not change the

name or identity of the offense charged, the defendant is entitled to a continuance 'unless it clearly appears from the whole of the proceedings that the defendant has not been misled or prejudiced by the defect or variance in respect to which the amendment is made.' " *Id.*, quoting Crim.R. 7(D).

{¶ 23} Whether an amendment changes the name or identity of the offense charged is a matter of law that we review de novo. *State v. Frazier*, 2d Dist. Clark No. 2008 CA 118, 2010-Ohio-1507, ¶ 22. "If the amendment does not change the name or identity of the crime charged, then we apply an abuse of discretion standard to review the trial court's decision to allow a Crim.R. 7(D) amendment." (Citations omitted.) *Id.* at ¶ 23. An abuse of discretion occurs when the decision of a court is "unreasonable, arbitrary, or unconscionable." (Citation omitted.) *AAAA Enterprises, Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990).

{¶ 24} In this case, amending the indictment to allege that the offenses in Counts 1, 2, 3, 6, 7, and 8 occurred in Greene and Pike Counties did not change the name or identity of the charges brought against Pheanis. *See State v. Williams*, 53 Ohio App.3d 1, 5, 557 N.E.2d 818 (10th Dist.1988). Furthermore, the record establishes that Pheanis was not mislead or prejudiced by the amendment, as his counsel indicated prior to trial that through the State's discovery he was aware that a portion of the offenses in the indictment were alleged to have occurred in Greene and Pike Counties. Pheanis's defense counsel also stated on the record that he was prepared to go forward with trial despite the amendment at issue. Accordingly, it was proper for the trial court to amend the indictment under Crim.R. 7(D), and such a decision was not an abuse of discretion.

{¶ 25} Pheanis's First Assignment of Error is overruled.

**Second Assignment of Error**

{¶ 26} Pheanis's Second Assignment of Error is as follows:

THE JURY'S VERDICT ON ALL COUNTS WAS AGAINST THE MANIFEST

WEIGHT OF THE EVIDENCE

{¶ 27} Under his Second Assignment of Error, Pheanis challenges his conviction on all twelve counts of rape and sexual battery as being against the manifest weight of the evidence. In support of this claim, Pheanis argues that L.'s testimony explaining how the rapes occurred lacked credibility. He also argues that a portion of L.'s testimony was inconsistent with earlier statements she made to police.

{¶ 28} "A weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." (Citation omitted.) *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 12. When evaluating whether a conviction is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact " 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). A judgment should be reversed as being against the manifest weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction."

(Citations omitted.)    *Martin* at 175.

{¶ 29} "The credibility of the witnesses and the weight to be given to their testimony are matters for the trier of facts to resolve."    *State v. Hammad*, 2d Dist. Montgomery No. 26057, 2014-Ohio-3638, ¶ 13, citing *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967).    It is well established that the trier of fact may credit some, part, or none of the testimony of a witness.    *State v. Butt*, 2d Dist. Montgomery No. 22774, 2009-Ohio-6814, ¶ 19, citing *State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964).    Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997). "This court will not substitute its judgment for that of the trier of facts on the issue of witness credibility unless it is patently apparent that the factfinder lost its way."    (Citation omitted.)    *State v. Bradley*, 2d Dist. Champaign No. 97-CA-03, 1997 WL 691510, *4 (Oct. 24, 1997).

{¶ 30} As noted above, Pheanis was convicted of two counts of rape of a minor under the age of 10 and one count of rape of a minor under the age of 13 in violation of R.C. 2907.02(A)(1)(b), which provides that: "No person shall engage in sexual conduct with another who is not the spouse of the offender * * * when * * * [t]he other person is less than thirteen years of age, whether or not the offender knows the age of the other person."    The term " '[s]exual conduct' means vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another."

R.C. 2907.01(A).

{¶ 31} Pheanis was also convicted of three counts of rape by force or threat of force in violation of R.C. 2907.02(A)(2), which provides that: "No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." The term " '[f]orce' means any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A)(1). "A defendant purposely compels another to submit to sexual conduct by force or threat of force if the defendant uses physical force against that person, or creates the belief that physical force will be used if the victim does not submit." *State v. Schaim*, 65 Ohio St.3d 51, 600 N.E.2d 661 (1992), paragraph one of the syllabus. Therefore, in order to make a finding of force under R.C. 2907.02, "some amount of force must be proven beyond that force inherent in the crime itself." *State v. Dye*, 82 Ohio St.3d 323, 327, 695 N .E.2d 763 (1998).

{¶ 32} In addition, Pheanis was convicted of six counts of sexual battery in violation of R.C. 2907.03(A)(5), which provides that: "No person shall engage in sexual conduct with another, not the spouse of the offender, when * * * [t]he offender is the other person's natural or adoptive parent, or a stepparent, or guardian, custodian, or person in loco parentis of the other person." It is undisputed that Pheanis is L.'s natural father.

{¶ 33} L.'s testimony regarding the two incidents that occurred in the Greene County residence toy room formed the basis of the two counts of rape of a minor under the age of 10, as well as two of the sexual battery counts. It is undisputed that L. resided at the Greene County residence between 2004 and 2006, when she was between the ages of five and seven. L. testified that on two separate occasions, Pheanis put his penis

inside her bottom when he took her to the toy room to be spanked. At trial, L. was able to convey the specific reason why Pheanis took her to the toy room to spank her on each occasion and also testified in detail as to how she and Pheanis were positioned during the abuse. The details L. testified to at trial would permit a rational trier of fact to find that on two separate occasions Pheanis engaged in sexual conduct with L. in the toy room at the Greene County residence by way of anal penetration.

{¶ 34} L.'s testimony regarding the camping trip formed the basis of the count for rape of a minor under 13 years of age, as well as one of the sexual battery counts. It is undisputed that in September 2008, L. went on a camping trip with her family to her great aunt's property in Pike County, Ohio, when L. was nine years old and in the fourth grade. L. testified that during this trip she and Pheanis went on a nature walk in the woods where Pheanis tripped her, pulled off her pants and underwear, and put his penis inside her vagina. L. again testified to various details regarding this incident, including Pheanis using her underwear to wipe her blood off his penis and then throwing the underwear in a creek. L. also recalled Pheanis confiscating another pair of her underwear during a bath later the same day because there was blood in them. L.'s testimony would permit a rational trier of fact to find that Pheanis engaged in sexual conduct with L. during the camping trip by way of vaginal penetration.

{¶ 35} L.'s testimony regarding the three incidents of abuse at the Montgomery County residence formed the basis of the three counts of rape by force or threat of force, as well as three of the sexual battery counts. L. testified that during the incident in the basement, her father pulled her off the desk she was sitting on and shoved her head into the arm of a recliner where he then inserted his penis into her vagina while she was bent

over the arm of the chair with his hand holding her head. As for the incident in the living room, L. testified that Pheanis pulled her off the loveseat she was sleeping on, duct taped her mouth shut, and then inserted his penis into her vagina on the living room floor. During the final incident on the front porch, L. testified that after trying to fight Pheanis off, he duct taped her hands to a bed rail above her head, as well as her mouth, and then inserted his penis into her vagina. L.'s testimony regarding these three incidents would permit a rational trier of fact to find that Pheanis engaged in sexual conduct with L. in the basement, living room, and front porch of the Montgomery County residence by way of vaginal penetration, and did so using physical force.

{¶ 36} The fact that the jury chose to believe L.'s testimony regarding each incident of abuse does not mean that Pheanis's conviction was against the manifest weight of the evidence. Simply stated, "the jury was free to believe, or disbelieve, any part of the witnesses' testimony, and a conviction is not against the manifest weight of the evidence merely because the jury believed the prosecution's testimony." (Citation omitted.) *State v. Arega*, 2012-Ohio-5774, 983 N.E.2d 863, ¶ 30 (10th Dist.). Because the trier of fact could properly believe L.'s testimony and because the trier of fact is in the best position to determine the credibility of each witness by taking into account inconsistencies, as well as the witnesses' manner and demeanor, we cannot conclude this record presents a scenario where the jury clearly lost its way or a manifest injustice has been created. Accordingly, we do not find that Pheanis's conviction is against the manifest weight of the evidence.

{¶ 37} Pheanis's Second Assignment of Error is overruled.

## Conclusion

**{¶ 38}** Having overruled both assignments of error raised by Pheanis, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

FROELICH, P.J. and DONOVAN, J., concur.

Copies mailed to:

Mathias H. Heck, Jr.
Dylan Smearcheck
Mark A. DeYoung
Hon. Mary Katherine Huffman