[Cite as *State v. Estes*, **2019-Ohio-1383.**]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
GREENE COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 2018-CA-20 |
| | : | |
| v. | : | Trial Court Case No. 2016-CR-449 |
| | : | |
| ANDRE T. ESTES | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 12th day of April, 2019.

. . . . . . . . . .

NATHANIEL R. LUKEN, Atty. Reg. No. 0087864, Greene County Prosecutor's Office, Appellate Division, 55 Greene Street, 1st Floor, Xenia, Ohio 45385
    Attorney for Plaintiff-Appellee

MICHAEL R. PENTECOST, Atty. Reg. No. 0036803, 117 S. Main Street, Suite 400, Dayton, Ohio 45422
    Attorney for Defendant-Appellant

. . . . . . . . . . . .

HALL, J.

{¶ 1} Andre Estes appeals from his convictions for rape of a person under 13 years of age and for attempted rape of a child under 10 years of age. Estes contends that the trial court erroneously admitted evidence under Evid.R. 404(B) and contends that his convictions were against the manifest weight of the evidence. We conclude that there is no merit to either contention, and we affirm.

## I. Procedural History and Evidence Presented

{¶ 2} In August 2016, Estes was indicted on three counts related to engaging in sexual conduct with his then seven-year-old daughter: one count of rape of a person under 13 years of age, in violation of R.C. 2907.02(A)(1)(b); one count of sexual battery, in violation of R.C. 2907.03(A)(5); and one count of attempted rape of a child under 10 years of age, in violation of R.C. 2923.02(A) and 2907.02(A)(1)(b), accompanied by a sentence-enhancing specification based on the victim's age.

{¶ 3} The state's evidence included Estes's cell phone. Estes moved for an independent forensic examination of the phone, which the trial court granted. Examination of the phone revealed web-browser history that included pornographic search terms and websites. Estes filed a motion in limine to exclude this evidence as evidence of other crimes, wrongs, or acts inadmissible under Evid.R. 404(B). The trial court overruled the motion.

{¶ 4} The case proceeded to a jury trial. At trial, the state presented the testimony of several witnesses, including the victim, "Jane"[1]; Jane's mother and Estes's former wife;

---

[1] We use this pseudonym to protect the privacy of the minor child.

a pediatric sexual assault nurse examiner at Dayton Children's Hospital; two people who worked at Michael's House Child Advocacy Center; forensic scientists at the Ohio Bureau of Criminal Investigation; and the digital forensic examiner who examined Estes's cell phone. Estes testified in his own defense.

{¶ 5} Jane, who was 8 years old at the time of the trial, testified that, in her bedroom in her family's home, her father had "put his private in my bottom." (Tr. 34.) According to Jane, he did this while she laid on her stomach on her bed without pants or underwear, and he stood behind her. She said that when Estes did this, it hurt a little. Jane also testified that Estes "put his private in my mouth." (Tr. 38.) This too happened in her bedroom; she stated that she was sitting on her bed and he was standing in front of her. Jane said that his penis felt a little hard in her mouth. When Estes removed his penis from her mouth, said Jane, white stuff fell from it onto her pink "Hello Kitty" rug. Jane testified that Estes told her not to tell anyone, because it was a secret. She also said that before they went to her room, Estes told her brothers to watch the baby.

{¶ 6} Jane's mother testified that she and Estes married in 2009 and had four children; they were married at the time of the alleged offenses but divorced in 2017. Mother testified that, around the first weekend in June 2016, she went to Alabama to pick up her son from his grandmother's house and was gone for five days. Near the end of June, Mother discovered that pornographic videos had been viewed in the YouTube app on her cell phone, which Jane had just been using. Mother confronted her and asked Jane if "anybody [had] ever done anything to you that you've seen on the videos?" (Tr. 145.) Mother said that Jane hesitated and looked afraid but eventually she said, "daddy." (Tr. 149.) "She said that her daddy had put his penis in her mouth and in her bottom,"

Mother testified, and "[s]he said that she was scared to tell me because he told her not to say anything to me or her brothers and that it would be their secret." (Tr. 150.) According to Mother, Jane said that Estes did these things to her while Mother was in Alabama. Mother said that Jane told her that stuff had come out of his penis and got on her back and the floor, and that he had wiped it off her back. Jane also told her that Estes had put Vaseline and baby oil on her bottom. When Mother heard this, she remembered that three weeks to a month earlier, she had been looking for the Vaseline to put on the baby, because it was not in the cabinet where it normally was. Later that day, she found it in Jane's room with a couple of Estes's shirts beside it.

{¶ 7} Mother took Jane to be examined at Dayton Children's Hospital and later took her to Michael's House Child Advocacy Center. The night that Jane told Mother about what Estes had done, Mother called the police, who came and picked up Estes. When he returned, said Mother, he grabbed some belongings from the house "[b]ecause his mother and his brother w[ere] there from Tennessee to pick him and his two sons up." (Tr. 191.) Mother also testified that Estes "seemed to be upset or angry about our sex life." (Tr. 187.) "I think he wanted me to be more sexually active than what I already was in the marriage," she said. (Tr. 188.) Mother denied making up these allegations and denied coaching Jane on what to say. Mother also denied searching for pornography on Estes's phone and said that she and Estes never had sex in Jane's room.

{¶ 8} Kelly Azzam was the pediatric sexual assault nurse examiner at Dayton Children's Hospital who examined Jane. She testified that Jane told her that there had been no vaginal penetration but that there had been anal and oral penetration. Jane specifically told Azzam that her father had been putting his penis in her mouth and bottom.

Azzam saw no injuries during her examination, but she said that that was not uncommon.

{¶ 9} The police collected the "Hello Kitty" rug from Jane's room and sent it to the Ohio Bureau of Criminal Investigation (BCI) for analysis. Patrick Crawford was the forensic scientist at the BCI who analyzed the rug, and he testified that he found semen on it. Timothy Augsback, another forensic scientist at the BCI, testified that he compared the DNA of the semen found on the rug with a sample of DNA taken from Estes and concluded that the DNA matched.

{¶ 10} Teresa Wiles was the manager of Michael's House Child Advocacy Center and conducted an initial forensic interview with Jane. Wiles testified that Jane told her that her father put his "private" in her bottom and in her mouth. Jane said that beforehand, her father asked her brother to watch the other kids. Jane told Wiles that when her father put his private in her bottom, she was sitting on the front of the bed with her pants and underwear off and that it hurt a little bit. She also told Wiles that she had to rub her father's private and put it in her mouth and that it was nasty and tasted like urine. Jane further told Wiles that white stuff came out of his private and fell on her clean carpet and her bottom. On cross-examination, Wiles testified that Jane had told her both that the baby was not there and that Estes had told the other children to watch the baby. Jane also told her that this happened in the shower, the living room, her mom's room, and her own room. Wiles testified that it was common for there to be inconsistencies in disclosures from a child victim of sexual abuse. She explained: "Well, when kids are telling different people their story it's just like us as adults, we're unlikely to give every detail over and over as we tell each individual. We may leave out something. We may add something that we remember. I always think of myself going to a grocery store and if someone asked me everything that

I bought last week, I might be able to give a list but remember a couple of items later. And so something that can cause some inconsistency; also just how the child is feeling that day can cause some inconsistency." (Tr. 567.)

{¶ 11} Amy Ferguson also worked at Michael's House and performed a follow up forensic interview with Jane. Ferguson testified that Jane told her too that Estes put his private in her bottom, while she was on the bed and he was standing next to the bed, and that it hurt a little. Jane said that he also made her put his private in her mouth, while she was sitting and he was standing, and that white stuff came out of his private and spilled onto her "Hello Kitty" rug. Jane told Ferguson that it happened only in her bedroom, on her bed, and that white stuff got on her bottom, which Estes wiped off with a towel. Jane told Ferguson that Estes did not put anything on her bottom before putting his private in.

{¶ 12} Christopher Cox was the digital forensic examiner at Binary Intelligence who performed the forensic examination of Estes's cell phone. Cox testified that his examination revealed web history that included a number of pornographic websites relating to fathers engaging in sexual activity with their daughters. For example, one of the sites was titled "Real father f***s naughty teen daughter very hardcore; Xvideos.com." (Tr. 786.) There were also web searches that used terms like "real taboo" and "real father and daughter webcams." (Tr. 823, 825.) Cox said that the name associated with all of the accounts on the phone was Andre Estes, that the searches and websites were all viewed in Xenia, and that the timestamps on the web history entries were all between 7:45 a.m. and 8:52 a.m. on June 2, 2016. Cox said that a timestamp could be changed but only by a person with the relevant technical knowledge. He said that he did not see any evidence of tampering with the files on Estes's phone.

{¶ 13} Finally, Estes testified in his own defense. He said that his marriage was rocky and that there were problems related to infidelity, finances, their sex life, and his smoking marijuana. Estes admitted that he visited the websites shown in the web history but explained that he was simply looking for certain performers and that the videos did not show real fathers and daughters engaging in sexual activity. He denied sexually abusing Jane. He explained that his semen was on the "Hello Kitty" rug because he and his wife would have sex in Jane's room using a condom that he would drop beside the bed when they finished and pick up when they left the room.

{¶ 14} The state dismissed the sexual-battery charge. During its charge to the jury, the trial court gave a limiting instruction that evidence about the commission of other acts could be used to prove only Estes's "opportunity, intent, preparation, and or plan to commit the offenses charged" and could not be used to "prove the character of the Defendant in order to show that he acted in conformity with that character." (Tr. 1046.) The jury found Estes guilty of the rape and attempted-rape charges and the mandatory prison-term specification. The trial court sentenced Estes to life in prison without the possibility of parole for rape and to a mandatory 10 years to life in prison for attempted rape, to be served consecutively.

{¶ 15} Estes appeals.

## II. Analysis

{¶ 16} Estes presents two assignments of error for our review. The first challenges the admission of the web history and search terms recovered from his cell phone. The second asserts that his conviction was against the manifest weight of the evidence.

### A. Admission of web history

{¶ 17} The first assignment of error alleges:

THE TRIAL COURT ERRED IN ADMITTING OVER DEFENSE OBJECTION EVIDENCE OF INTERNET SEARCHES AND WEB SITE DATA EXTRACTED FROM APPELLANT'S CELL PHONE.

{¶ 18} Evid.R. 404(A)(1) "is a general prohibition on using evidence of a person's character to prove that he acted 'in conformity therewith on a particular occasion.' " *State v. Tench*, Ohio Sup. Ct. Slip Opinion No. 2018-Ohio-5205, __N.E.3d__, ¶ 139. Evid.R. 404(B) provides: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *See also* R.C. 2945.59 ("In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto * * *.").

{¶ 19} The Ohio Supreme Court has laid out a three-step analysis to determine whether other-acts evidence is admissible. "The court must consider (1) whether the other-acts evidence is relevant under Evid.R. 401, i.e., whether it tends to make the existence of any fact of consequence to the determination of the action more or less probable than it would be without the evidence, (2) whether the evidence is presented to prove a person's character to show conduct in conformity therewith, or whether it is

presented for a legitimate other purpose, [and] (3) whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice, Evid.R. 403." *Tench* at ¶ 139, citing *State v. Williams,* 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, ¶ 20. The Court has emphasized that " 'the rule affords broad discretion to the trial judge regarding the admission of other acts evidence.' " *Id.*, quoting *Williams* at ¶ 17.

{¶ 20} Estes does not dispute that the first and second steps of the analysis are satisfied. The first step asks whether the web history and search terms are relevant to making any fact that is of consequence to the determination of this action more or less probable than it would be without the evidence. The web history related to father/daughter sexual activity and the searches were at or about the time of the alleged sexual encounters involving Estes and Jane. The state's purpose in presenting the web history and search terms in this case was to show Estes's motive, intent, or plan to engage in sexual activity with his daughter. *Compare State v. Dolman*, 6th Dist. Williams No. WM-10-007, 2010-Ohio-5505, ¶ 23-24 (photographs found on the defendant's computer showing scantily clothed or nude young girls in erotic or suggestive poses tend to show the defendant's sexual interest in young females like the victims, that is, his motive, plan, or intent in photographing them in the nude or in their underwear). The second step asks whether the web history and search terms were presented to prove Estes's character in order to show activity in conformity therewith. The state did not offer the web history and search terms to show that raping his daughter was in conformity with Estes's character. Indeed, the trial court gave the jury a limiting instruction that this evidence could not be used for that purpose. "We presume the jury followed those instructions." (Citations omitted.) *Williams* at ¶ 23.

**{¶ 21}** The focus of Estes's argument here, and in his motion in limine, is the third step, which asks whether the probative value of the web history and search terms was substantially outweighed by the danger of unfair prejudice. In *Williams*, the Ohio Supreme Court concluded that testimony that the defendant was abusing one of the victims was not unduly prejudicial "because the trial court instructed the jury that this evidence could not be considered to show that [the defendant] had acted in conformity with a character trait." *Williams* at ¶ 24. The trial court here similarly instructed the jury during its jury charge at the end of the trial. It is true that the trial court in *Williams* gave a limiting instruction both at the time the witness testified and during its charge to the jury at the end of the trial, which we encourage as the best practice, but the single instruction has been held to be sufficient. The Ohio Supreme Court has indicated that where a limiting instruction is given in connection with the admission of Evid.R. 404(B) evidence, the jury is presumed to have followed the instruction. *State v. Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, 984 N.E.2d 948, ¶ 194. And we have concluded that a single limiting instruction given during the jury charge is sufficient. *State v. Landers*, 2d Dist. Greene No. 2015-CA-74, 2017-Ohio-1194, ¶ 60-62 (noting that two limiting instructions were given in *Williams* but citing *Jones* in support of the conclusion that one is enough). We presume that the jury here followed the trial court's limiting instruction and relied on the web history and search terms only for a legitimate purpose.

**{¶ 22}** We conclude that Evid.R. 404(B) permitted admission of the web history and search terms because they helped to prove motive, intent, and plan on the part of Estes. Because the trial court instructed the jury on the proper use of this evidence, the prejudicial effect of the evidence did not substantially outweigh its probative value, and

the trial court did not abuse its discretion by admitting the evidence.

**{¶ 23}** The first assignment of error is overruled.

**B. Manifest weight of the evidence**

**{¶ 24}** The second assignment of error alleges:

THE JUDGMENT OF THE TRIAL COURT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

**{¶ 25}** Estes contends that inconsistencies in Jane's and Mother's testimony and Mother's lack of credibility undermined the jury's guilty verdicts. Estes does not cite specific inconsistencies, but he refers us to the trial transcript where, he says in his brief, "[d]etails of these inconsistencies are succinctly outlined and summarized in defense counsel's closing argument."

**{¶ 26}** "A weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." (Citation omitted.) *State v. Cassell*, 2d Dist. Clark No. 09CA0064, 2011-Ohio-23, ¶ 46. When a conviction is challenged on appeal as being against the manifest weight of the evidence, " '[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). The credibility of the witnesses and the weight to be given to their testimony are matters for the trier of fact to resolve. *Cassell* at ¶ 48, citing *State v. DeHass*, 10 Ohio St.2d 230,

227 N.E.2d 212 (1967). "Because the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness." *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (August 22, 1997).

{¶ 27} Estes argues that the evidence reveals that Jane was inconsistent as to what had happened, when, where, how often and in the details of the specific acts alleged to have occurred. The state acknowledges that there were inconsistencies in Jane's testimony concerning facts like her position on the bed, whether the baby was in the house during the abuse, where in the house the abuse occurred, whether Jane had ever seen pornographic videos, and whether Estes used Vaseline and baby oil. But Wiles, the Michael's House manager, testified that it is common for there to be inconsistencies in disclosures from a child victim of sexual abuse. Furthermore, none of the inconsistencies directly undermined the finding that Estes committed the two acts of sexual conduct, and Jane never wavered from her claim that Estes put his penis in her bottom and in her mouth. The only conflicting evidence was Estes's own denial testimony.

{¶ 28} Estes also contends that Mother's testimony was not credible because of numerous inconsistencies and factual discrepancies and because she was seeking revenge against him. The revenge theory formed the basis of Estes's defense at trial. He argued that Mother had concocted the abuse story and coached Jane to make the

allegations after Estes told Mother that he had cheated on her and was preparing to go live in Tennessee with his family. But Mother expressly denied making up the accusations and denied coaching Jane. Also, both Wiles and Ferguson testified that Jane's responses during her forensic interviews at Michael's House were age appropriate, which suggests that she was not coached, because coaching by an adult arguably would cause a child to use adult words and phrases.

{¶ 29} During closing arguments, defense counsel pointed out to the jury all the inconsistencies and problems with the testimony. Yet the jury still found that Estes engaged in and attempted to engage in acts of sexual conduct. That the jury chose to believe Jane's testimony over Estes's testimony does not show that the convictions were against the manifest weight of the evidence. " '[T]he jury was free to believe, or disbelieve, any part of the witnesses' testimony, and a conviction is not against the manifest weight of the evidence merely because the jury believed the prosecution's testimony.' " (Citation omitted.) *State v. Pheanis*, 2d Dist. Montgomery No. 26560, 2015-Ohio-5015, ¶ 36, quoting *State v. Arega*, 2012-Ohio-5774, 983 N.E.2d 863, ¶ 30 (10th Dist.). The jury could have properly believed Jane's testimony, as the jury was "in the best position to determine the credibility of each witness by taking into account inconsistencies, as well as the witnesses' manner and demeanor." *Id.*

{¶ 30} To be found guilty of rape, there must be proof that the defendant engaged in "sexual conduct" with the victim. R.C. 2907.02(A)(1). The definition of "sexual conduct" includes fellatio and anal intercourse. R.C. 2907.01(A). Here, Jane's testimony that Estes engaged in fellatio with her and attempted to engage in anal intercourse with her formed the basis of the two charges. Jane's testimony that white stuff came out of Estes's penis

and spilled onto her "Hello Kitty" rug and expert testimony that Estes's semen was found on the rug strongly corroborate Jane's fellatio allegation. Jane's testimony would permit a rational trier of fact to find that Estes engaged in sexual conduct with her by way of fellatio and attempted to engage in sexual conduct with her by way of anal intercourse. *Compare Pheanis* at ¶ 34 ("L.'s testimony regarding the camping trip formed the basis of the count for rape of a minor under 13 years of age, as well as one of the sexual battery counts. * * * L's testimony would permit a rational trier of fact to find that Pheanis engaged in sexual conduct with L. during the camping trip by way of vaginal penetration."). This is not a case in which the jury clearly lost its way and created a manifest miscarriage of justice.

{¶ 31} The second assignment of error is overruled.

### III. Conclusion

{¶ 32} We have overruled both of the assignments of error presented. The trial court's judgment is affirmed.

. . . . . . . . . . . .

DONOVAN, J. and TUCKER, J., concur.

Copies sent to:

Nathaniel R. Luken
Michael R. Pentecost
Hon. Michael A. Buckwalter