[Cite as *State v. Landers*, 2017-Ohio-1194.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
GREENE COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| *Plaintiff-Appellee* | : | Appellate Case No. 2015-CA-74 |
| | : | |
| v. | : | Trial Court Case No. 2013-CR-283 |
| | : | |
| JOSHUA LANDERS | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| *Defendant-Appellant* | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 31st day of March, 2017.

. . . . . . . . . . .

NATHANIEL R. LUKEN, Atty. Reg. No. 0087864, Assistant Prosecuting Attorney, Greene County Prosecutor's Office, 61 Greene Street, Xenia, Ohio 45385
     Attorney for Plaintiff-Appellee

ROBERT ALAN BRENNER, Atty. Reg. No. 0067714, 120 West Second Street, Suite 706, Dayton, Ohio 45402
     Attorney for Defendant-Appellant

. . . . . . . . . . . . .

WELBAUM, J.

**{¶ 1}** Defendant-Appellant, Joshua Landers, appeals from his conviction and sentence on one count of engaging in sexual conduct with a person less than 13 years of age, Rape, a violation of R.C. 2907.02(A)(1)(b). After his conviction, Landers was sentenced to a prison term of 10 years to life, and was designated a Tier III sex offender.

**{¶ 2}** In support of his appeal, Landers contends that he was deprived of the right to a fair trial because the trial court permitted the State to introduce evidence under Evid.R. 404(B) without a contemporaneous limiting instruction, and because the court granted the State's motion to dismiss a count of Attempted Rape after the State concluded its case-in-chief.

**{¶ 3}** Landers further contends that the trial court erred in overruling his motion for a lesser included offense instruction, and by telling Landers that he could earn days of jail credit under R.C. 2967.193. Finally, Landers argues that his conviction was against the manifest weight of the evidence and that he was deprived of the effective assistance of counsel.

**{¶ 4}** We conclude that no error occurred in the trial court, with the exception of the inclusion in the judgment entry of reference to earned jail credit. However, that error was harmless beyond a reasonable doubt. Accordingly, the judgment of the trial court will be affirmed, with the exception that the judgment of the trial court will be modified to indicate that Landers is not entitled to earn jail credit under R.C. 2967.193.

## I. Facts and Course of Proceedings

**{¶ 5}** In June 2013, the State filed a four-count indictment against Landers, alleging

that between March 2, 2013, and March 3, 2013, Landers had sexual conduct with a person less than thirteen years of age. The indictment included three counts of Rape and one count of Attempted Rape.

{¶ 6} After Landers entered a not guilty plea, he filed a motion in July 2013, asking for exclusion of DNA results, money to hire a DNA expert, and exclusion of similar acts evidence. A jury trial was held in September 2014, and resulted in a hung jury.

{¶ 7} Subsequently, the State filed notice that it intended to use evidence of Landers' prior bad acts. These acts involved testimony that two weeks prior to the alleged rapes, Landers began "grooming" the victim, A.G., by exposing her to sexual contact. Landers then filed a motion to exclude the other acts evidence. However, on November 4, 2015, the trial court denied Landers' motion to exclude the evidence.

{¶ 8} The case was then tried to a jury beginning on November 9, 2015. At the conclusion of its case, the State dismissed the Attempted Rape charge (Count IV). The jury then found Landers not guilty of two counts of Rape and guilty of one count of Rape (Count Three), and Landers was sentenced as noted above.

{¶ 9} At trial, the State presented evidence from A.G., the victim, "Jane," A.G.'s mother, and two family friends, "Mary" and "Linda" (the latter of whom was Landers' roommate).[1] In addition, the State presented the testimony of a police officer who investigated the rape allegations; the doctor who examined A.G.; and two forensic scientists employed at the Ohio Bureau of Criminal Investigation ("BCI"). The defense presented testimony from a forensic DNA expert.

---

[1] In order to protect A.G.'s privacy, we have used her initials, and pseudonyms for her mother and the two witnesses who were family friends.

{¶ 10} A.G. testified that when the alleged incidents occurred in March 2013, she was 10 years old. She turned 11 the following month. At the time, A.G. lived in an apartment in Xenia with her mother, Jane, and Jane's boyfriend, "Thomas" (also a pseudonym). Thomas had lived with them since A.G. was two years old, and she referred to him as her "Dad," although he was not her biological father. At the time of trial, Thomas no longer lived with A.G. and Jane.

{¶ 11} In February and March 2013, Jane worked as a certified nurse aide. Jane's shift was from 7 p.m. to 7 a.m. on Saturdays and Sundays. Jane and Mary were best friends, and Linda, who was Landers' roommate, was also Jane's good friend. Linda and Landers lived about a three-minute walk away from Jane's apartment. Linda and Landers worked together at a nearby McDonald's restaurant.

{¶ 12} Normally, when Jane was working, Thomas babysat for A.G., but if he were not available, Jane would find someone else to watch A.G. On Valentine's Day weekend of 2013, Jane arranged for A.G. to stay with Landers. Linda was out of town that weekend, and A.G. stayed alone with Landers on Saturday night so that she could attend church with Landers and his family on Sunday morning.

{¶ 13} The apartment that Landers and Linda shared consisted of a living room, kitchen, a bathroom, and two bedrooms. The bathroom and bedrooms were upstairs; Landers occupied one bedroom and Linda occupied the other.

{¶ 14} According to A.G., she and Landers were upstairs in his bedroom on that Saturday night and were laying down on Landers' blowup bed. They discussed Valentine's Day, and Landers told A.G. he was upset that she had not gotten him a gift. Landers then wrapped his hands around A.G.'s head, like a pillow. Before A.G. went to

sleep, Landers touched her breasts and said that whatever he touched was "his." A.G. said, "Okay." Landers also touched her vagina with his hand. A.G. had on pajamas, and Landers put his hand up under her shirt and under her pants. She had underwear on at the time and Landers was touching fabric.

{¶ 15} Landers then told A.G. to bend over and she did. He told her not to be scared, that it was just a flashlight. He then took his penis and rubbed it between her "butt" and then her vagina, and subsequently ejaculated. A.G. also French-kissed Landers. Landers told A.G. not to tell anyone, that it would be their little secret, and she agreed.

{¶ 16} According to A.G., nothing happened between that time and March 2, 2013, which was also a Saturday night. A.G.'s mother was working, and A.G. again stayed at Landers' apartment. This time, Linda was also home.

{¶ 17} A.G. testified that on this occasion, she and Mary (who was friends with Jane and with Linda), went to Landers' apartment so that Mary could watch a TV show that she liked to watch. At the time, Linda was asleep on the couch. At first, Mary and A.G. sat in Landers' room and talked. A movie, "G.I. Joe," was playing on the TV in Landers' room. Mary then went into Linda's bedroom to watch her show. At this time, Landers was sitting on the floor next to the blowup bed and A.G. was laying on the bed, with her clothes on. Landers stuck his finger in A.G.'s vagina and made a clockwise movement, in and out. A.G. stated that she enjoyed it, but it felt different later, as that area was burning. Subsequently, A.G. sucked Landers' penis with her mouth. Landers ejaculated, but into a towel or his shirt, rather than in her mouth.

{¶ 18} After that, A.G. went back to watching the movie. She did not finish the

movie because Mary's show had ended. Mary told her it was time to go, and they walked back to A.G.'s house. A.G. did not tell Mary what had happened. Mary then told A.G. she was supposed to spend the night at Linda's apartment, so they packed clothes for the next day, including a shirt, some khakis, and a pair of underwear. As A.G. and Mary walked back toward Linda's apartment, they saw Landers, who was walking to McDonald's. Mary handed A.G. over to Landers and went back to her own house. A.G. and Landers went to McDonald's. When they returned to Linda's apartment, Linda was still asleep on the couch. A.G. went upstairs, took a shower, and dried herself off with a clean towel she had gotten from the hallway closet. She put on clean underwear and her pajamas.

{¶ 19} A.G. then went back into Landers' room and started to finish watching G.I. Joe. Landers was again on the floor next to the bed. A.G. once more sucked on his penis and he ejaculated into a towel or shirt. After that, Landers told A.G. to bend over. Landers then tried to put his penis in her butt and she yelled. She told him to take it out because she did not like it.

{¶ 20} According to A.G., her pajama shirt was on and her pants and underwear were rolled down to her ankles. A.G. testified that Landers' penis went into her "butthole" but not all the way. She told him to get it out, and that she was going to tell. After this happened, A.G. got up and went to bed in Linda's room. The next day, A.G. went to church with Landers, his mother, and his niece. At church, A.G. told Landers' niece and several other girls about what had happened the night before. She did not tell any adults.

{¶ 21} That day, on Sunday, March 3, 2013, A.G. told her mother, Jane, that Landers had molested her. That night, A.G.'s mother took her to the hospital, where she

had a pelvic examination. According to A.G., she had changed her outer clothes that day but was still wearing the underwear she had on the night before. A.G. stated that she told only her mother, that day, what had happened in its entirety. With the other people, it came out in bits and pieces.

{¶ 22} In contrast to A.G., Mary testified that she never went over to Linda's apartment with A.G. on March 2, 2013, and never went there to watch a show of her own. Mary stated that she went over to A.G.'s house that night at the request of A.G.'s mother, to get A.G. ready for Sunday church. This was shortly after A.G.'s mother left to work. She helped A.G. pack a bag, putting in a Sunday dress, shoes, stockings, and clean underwear.

{¶ 23} As she and A.G. walked out of the door of A.G.'s apartment, they ran into Landers, who was heading over to McDonald's. Mary asked Landers to get A.G. a sandwich, and left A.G. with him. Mary then went to check on her own child, and later went back to Linda's apartment to check on A.G. She went upstairs, got A.G. from Landers' bedroom, and made A.G. take a shower. Mary got a clean towel from Linda's linen closet. A.G. then dried off and put on her pajamas. Mary made A.G. brush her teeth, and that was her last encounter with A.G. When she left, it was around 9:00 p.m., and A.G. was still in the bathroom. Linda was downstairs asleep on the couch.

{¶ 24} Linda testified, and indicated that she had been scheduled for an extra shift at McDonald's on March 2, 2013. Linda came home with a co-worker, and they were talking. Landers was there at the time. During the conversation, Linda fell asleep on the couch. She later woke up and went to bed. It was dark out at the time. When Linda went upstairs, A.G. was in Linda's bed, watching TV. She asked A.G. why she

was still awake, as A.G. had to get up in the morning. At that point, Linda took a shower and went to bed.

{¶ 25} Jane testified that she had lived in her apartment in Xenia for about 13 years. She was close friends with Linda, who lived in the same apartment complex. A.G. and Landers knew each other through Jane and Linda. Jane described Landers as family, like an uncle, and thought he was a positive role model.

{¶ 26} On Sunday, March 3, 2013, Jane was getting ready to go to work when A.G. told her something that caused her great concern. Jane called Mary and asked her to stay with A.G. At that point, Jane went to Linda's apartment and asked her to come outside so she could speak to her. Linda then called Landers, and the two women went to Landers' mother's house, brought Landers back to Linda's apartment, and had a lengthy conversation. When Jane confronted Landers, she did not tell him what A.G. had said, and Landers never indicated that he knew what she was talking about. Jane felt Landers was being evasive. Jane told Landers that A.G. had told her some things and that she was going to take A.G. to the hospital to have her checked out. Landers told her, okay, to go ahead and take A.G.

{¶ 27} At the time Jane talked with Landers, she understood that he had engaged in fellatio with her daughter. A.G. did not tell her that Landers had digitally penetrated her, nor had A.G. told her about anal intercourse. Jane stated that she did not allow A.G. to tell her more. At the moment, she was distraught and in shock.

{¶ 28} According to Linda, who was present for the conversation, Landers seemed in shock. He told them to do whatever they needed to do to make sure that A.G. was okay.

{¶ 29} Dr. Matre, an emergency department pediatrician at Dayton Children's Hospital, examined A.G. on March 3, 2013. Dr. Matre had been in practice for 37 years, and described the protocol for child victims of sexual assault. Like other victims, A.G. was seen by social services and a sexual abuse nurse, who is called a "SANE" nurse.

{¶ 30} The history presented to Dr. Matre was of digital manipulation in A.G.'s vaginal area and that the perpetrator had made her suck on his penis. A.G. had denied any actual intercourse or anal penetration. There was also a report that the week before last, the perpetrator had touched A.G.'s breasts and buttocks.

{¶ 31} Dr. Matre examined A.G., took colposcopic pictures, and collected evidence, including oral swabs, anal swabs, and vaginal swabs. Dr. Matre found a bruise on the upper right side of the vestibule, which is an area just inside the labia. He stated that the localized bruising was consistent with digital manipulation. He also conducted an anal exam, and did not find any anal trauma. His final impression was that A.G.'s injury was consistent with her history of sexual abuse.

{¶ 32} Dr. Matre stated that A.G. did not give any history of anal sex when she presented at the hospital. He further stated that in his experience of 37 years, children will commonly disclose sexual abuse gradually. He also said that, in his practice, he often has a history of penetration, both anally and vaginally, but often does not encounter physical findings.

{¶ 33} Sergeant Scott Beegle of the Xenia Police Division, who was a detective at the time of the alleged incidents, was assigned to the case on March 4, 2013. Beegle interviewed Landers at the police department on March 5, 2013. Landers voluntarily came in and was aware of the allegation. Landers denied everything. When Beegle

confronted Landers about the possibility of DNA evidence, Landers stated that the police would not find any of that anywhere on or around the alleged victim. Landers also said that A.G. "wore braces and that it was his preference not to let people with braces give him head." Transcript of Trial Proceedings, Vol. I, p. 161. In addition, Landers stated that he was "too large to have committed this crime for * * * her being 10 years old." *Id.*

{¶ 34} Landers was about 24 years old at the time of the alleged crimes. On March 22, 2013, Landers voluntarily gave Beegle a DNA sample. Beegle sent the sexual assault kit and DNA samples to the BCI to have everything tested. After receiving the results, Beegle spoke again to Landers. When Beegle confronted Landers with the DNA results, Landers had no response; just a blank stare.

{¶ 35} After Beegle met with the prosecutors, Landers was charged with four counts: Count One (alleged fellatio); Count Two (alleged digital penetration); Count Three (alleged anal intercourse); and Count Four (alleged attempted anal intercourse).

{¶ 36} Malorie Kulp, a forensic scientist in the Forensic Biology unit at BCI, performed initial tests on the sexual assault kit. The first test was a presumptive color change where a chemical is added. If there is a color change to pink, it is a weak reaction; if the change is to purple, the reaction is considered strong. Even if a color test is negative, Kulp looks for sperm cells under a microscope. The third test is a test for seminal fluid, which is the liquid component of semen, and works similar to a pregnancy test. A sample is added to a kit the BCI has, and if there are two lines, the test is negative. If there are three lines, the test is positive. However, if the positive line cannot be seen in a photograph, the results are considered inconclusive.

{¶ 37} On A.G.'s underwear, there was a color change to a dark purple area near

the top.  As a result, Kulp took a small cutting to send forward for DNA testing.  Kulp identified a single sperm cell on the underwear and no amylase was obtained.  Amylase is a component of saliva and other bodily fluids.

{¶ 38} Kulp did not identify any semen on the vaginal and oral swabs.  The anal swab was inconclusive for seminal fluid.  Kulp did see a weak positive line reaction for the anal swab, but could not see it in a photograph.  The anal swab was also sent on for further analysis.  In addition, Kulp sent the vaginal swabs forward, because more sensitive testing could identify possible skin cells, even though Kulp's testing had not identified any bodily fluids.  Kulp indicated that the purple area on the underwear was on the back panel, up near the top, not in the crotch area.  She also stated that she had done testing on articles of clothing in other cases, where she had found millions of sperm cells, as opposed to the single sperm cell in this case.

{¶ 39} Hallie Garofalo is a forensic scientist in the BCI DNA unit, and performed DNA tests on the articles that Kulp forwarded.  Garofalo described a four-step process for generating a DNA profile. The first is extraction, in which a detergent is used to break open cells, release the DNA, and wash away all the other profiles and material that are not needed.  Pure DNA results from this test.

{¶ 40} The second test is quantification, which counts how much DNA is present.  The third step is amplification, which is like chemical Xeroxing, and creates millions of copies of the DNA.  The fourth step is called detection, in which an instrument like a camera is used to take a snapshot of what the DNA profile looks like.

{¶ 41} In clothing like underwear worn by a female, a lot of the female's DNA would be left behind.  To evaluate this, a male-specific DNA test, the Y-STR test is used.

Garofalo applied the four DNA steps on the underwear and also performed a Y-STR test. On items where there is a possibility that semen might be present, a specialized extraction called a differential is done. This separates any sperm cells on the sample from non-sperm samples. In this test, the sample gets divided into two fractions or two portions. Ideally, one should contain the non-sperm cells, and the other should contain the sperm cells.

{¶ 42} Based on this testing, Garofalo concluded that Landers could not be excluded as a possible contributor to the DNA from the sperm fraction of the underwear. Based on a national FBI database, the portion of the population that cannot be excluded as possible contributors to the sperm fraction of the underwear is one in 838 unrelated individuals. A lower statistic in this regard results in a wider range of people to choose from. For example, statistical DNA estimates of one in a billion, trillion, or quadrillion have occurred. A sample with a statistic of one to a quadrillion would exceed the number of known people ever on the earth.

{¶ 43} In the U.S. Y-STR database, which is different from the FBI database, the frequency of the DNA profile for the sperm fraction was one in every 5,326 male individuals.

{¶ 44} A "low copy" number occurs when scientists are looking at DNA that is below their ideal target. Garofalo indicated that there is some controversy in the scientific community about low copy cases, because the possibility of including a non-contributor increases as the copy number lowers. When low copy data is involved, it is possible that the profiles are low, and it is possible that complete drop-out can occur, i.e., complete chunks of a profile are lost.

{¶ 45} Garofalo stated that based on the DNA profile, the Y-STR profile from the sperm fraction of the underwear did not appear to be a low copy profile. Garofalo concluded, based on the DNA profile generated that the required information was present to make an inclusion.

{¶ 46} The non-sperm fraction of the sample on the underwear had DNA consistent with Landers, but at a couple of locations, had additional male data that was not consistent with Landers. The defense expert, Dr. Heinig, also a DNA forensic expert, testified that a foreign allele was detected in the non-sperm portion of the DNA on the underwear, meaning that there were two male contributors to this profile and some of the DNA was foreign to Landers.

{¶ 47} No Y chromosome (a chromosome present only in male cells) DNA was obtained from the vaginal swabs. However, a partial Y chromosome DNA profile was obtained from the anal swabs. Neither Landers nor his paternal male relatives could be excluded from the partial Y chromosome DNA profile from the anal sample. The U.S. Y-STR database estimated the frequency of this profile as one in every 2,000 male individuals.

{¶ 48} At the conclusion of the State's case, the court permitted the State, over defense objection, to dismiss Count Four, which was the Attempted Rape charge. The court also refused to instruct the jury on attempted Rape as a lesser included offense.

{¶ 49} After hearing the evidence, the jury found Landers not guilty of the first two counts, and guilty of the anal Rape charge (Count III), and Landers was sentenced to ten years to life in prison. He was also designated a Tier III sex offender. Landers now appeals from his conviction and sentence.

## II. Use of 404(B) Evidence

{¶ 50} Landers' First Assignment of Error states that:

The Trial Court Erred When It Allowed the State to Use 404(B) Evidence at Trial Without a Contemporaneous Limiting Instruction, and This Error Deprived Landers of His Right to a Fair Trial Pursuant to the United States and Ohio Constitutions.

{¶ 51} Under this assignment of error, Landers contends that the trial court erred in allowing the State to submit evidence of his sexual contact with A.G. on or about February 16, 2013.   Landers was not charged with offenses relating to this conduct, and the State asked that the evidence be admitted as evidence that Landers was "grooming" A.G. for the acts that occurred on March 2, 2013.

{¶ 52} Ohio Evid.R. 404(B) provides that:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.   It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

{¶ 53} R.C. 2945.59 also provides that "[i]n any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved,

whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant."

**{¶ 54}** Evid.R. 404(B) "is in accord with R.C. 2945.59," and both the rule and statute adopt the common law to "preclude admission of other acts evidence to prove a character trait in order to demonstrate conduct in conformity with that trait * * *." (Citations omitted.)   *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, ¶ 16.   However, unlike R.C. 2945.59, Evid.R. 404(B) "contains no reference to materiality."   *Id.* at ¶ 17.   "Rather, [Evid.R. 404(B)] precludes the admission of evidence of crimes, wrongs, or acts offered to prove the character of an accused in order to demonstrate conforming conduct, and it affords the trial court discretion to admit evidence of other crimes, wrongs, or acts for 'other purposes,' including, but not limited to, those set forth in the rule.   Hence, the rule affords broad discretion to the trial judge regarding the admission of other acts evidence."   *Id.*

**{¶ 55}** The Supreme Court of Ohio has stressed that "[u]nless the trial court has 'clearly abused its discretion and the defendant has been materially prejudiced thereby, this court should be slow to interfere' with the exercise of such discretion."   *State v. Kirkland*, 140 Ohio St.3d 73, 2014-Ohio-1966, 15 N.E.3d 818, ¶ 67, quoting *State v. Hymore*, 9 Ohio St.2d 122, 128, 224 N.E.2d 126 (1967).

**{¶ 56}** "Generally, evidence of other acts is admissible if it is offered for a purpose other than to prove the character of a person in order to show action in conformity with that character, Evid.R. 404(B), it is relevant when offered for that purpose, Evid.R. 401, and the danger of unfair prejudice does not substantially outweigh its probative value.

Evid.R. 403." *Kirkland* at ¶ 68, citing *Williams* at ¶ 20.

{¶ 57} In *Williams*, the court stated that:

> The first step is to consider whether the other acts evidence is relevant to making any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. Evid.R. 401. The next step is to consider whether evidence of the other crimes, wrongs, or acts is presented to prove the character of the accused in order to show activity in conformity therewith or whether the other acts evidence is presented for a legitimate purpose, such as those stated in Evid.R. 404(B). The third step is to consider whether the probative value of the other acts evidence is substantially outweighed by the danger of unfair prejudice.

*Williams,* 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, at ¶ 20.

{¶ 58} As was noted, the State's purpose in presenting evidence about Valentine's Day weekend was to show that Landers was grooming A.G. In *Williams*, the court observed that " '[g]rooming refers to deliberate actions taken by a defendant to expose a child to sexual material; the ultimate goal of grooming is the formation of an emotional connection with the child and a reduction of the child's inhibitions in order to prepare the child for sexual activity' * * * ." *Id.* at ¶ 21, quoting *United States v. Chambers*, 642 F.3d 588, 593 (7th Cir.2011).

{¶ 59} The "other acts" evidence concerning Landers' conduct a few weeks before the alleged rapes was relevant to this issue, as it indicated an attempt to form an emotional connection with A.G. and a gradual introduction to sexual activity in order to

reduce A.G.'s inhibitions. It was also not presented as proof of Landers' character, but for a legitimate purpose, to show intent, plan, and preparation.

{¶ 60} As to the third step, the court in *Williams* concluded that the evidence was "not unduly prejudicial, because the trial court instructed the jury that this evidence could not be considered to show that [the defendant] had acted in conformity with a character trait." *Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, at ¶ 24. In *Williams*, the trial court gave the cautionary instruction both at the time the witness testified and during its charge at the end of the case. *Id.* at ¶ 8-9.

{¶ 61} In contrast, the trial court in the case before us refused to give a cautionary instruction at the time A.G. testified as to the prior acts; instead, the court said it would give a limiting instruction at the time of the charge to the jury. Transcript of Proceedings, Vol. I, pp. 24-25. Consistent with its promise, the court did, in fact, provide a limiting instruction when the jury was charged. *See* Transcript of Proceedings, Vol. II, p. 318. As a result, the trial court did not abuse its discretion in allowing the evidence as to prior sexual contact between Landers and A.G.

{¶ 62} The Supreme Court of Ohio has indicated that where a limiting instruction is given in connection with admission of 404(B) evidence, the jury is presumed to have followed the instructions given by the trial court. *State v. Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, 984 N.E.2d 948, ¶ 194. Thus, we presume that the jury followed the trial court's instructions.

{¶ 63} In a second issue under this assignment of error, Landers argues that the trial court erred by failing to give a contemporaneous instruction when A.G. testified about the "other acts" evidence. In this regard, Landers relies on our prior decision in *State v.*

*Shaw*, 2d Dist. Montgomery No. 21880, 2008-Ohio-1317.

{¶ 64} In *Shaw*, the defendant was charged with 15 counts of Rape of a Child Under the Age of Thirteen and 10 counts of Sexual Battery in connection with three of his minor daughters. *Id.* at ¶ 3. The trial court allowed "an extensive amount of 'other acts' testimony," but failed to give any limiting instruction about the evidence. *Id.* at ¶ 9. In this regard, we observed that "the State elicited extensive testimony from the three girls that they had endured ongoing sexual abuse by their father. Over the years the abuse of each girl was said to have occurred multiple times each week. While each of the girls testified to several specific instances of abuse, each also repeatedly testified, over ongoing objections, that the abuse had happened many other times." *Id.* at ¶ 11.

{¶ 65} In contrast to the situation in *Shaw*, the "other acts" testimony in the case before us was not extensive, and a limiting instruction was given.

{¶ 66} In *Shaw*, we stated that "[t]he limiting instruction should be given at the time the 'other acts' evidence is received, [*State v.*] *Lewis*, supra [66 Ohio App.3d 37, 583 N.E.2d 404 (2d Dist.1990)], and it has been held that the failure to give any limiting instruction constitutes plain error." (Citations omitted.) *Id.* at ¶ 13. We also found no justification for the extensive amount of other acts testimony. *Id.* at ¶ 14. We stressed that "[e]ven if some minimal reference to the pattern of abuse as part of the fabric of the victims' lives was more relevant than prejudicial, the pervasive nature of the testimony precluded Shaw's right to a fair trial. It is also significant that the trial court gave no limiting instruction regarding the 'other acts' testimony, either at the time the testimony was offered or in the jury instructions at the close of the trial." *Id.*

{¶ 67} Notably, in *Shaw*, we did not say that the limiting instruction "must" be given

at the time of the testimony. We used the terms "should" and "either" – meaning that the instruction could be given at the time of the testimony or at the end of the trial. *See also State v. Jordan*, 2d Dist. Montgomery No. 26163, 2016-Ohio-603, ¶ 25 (finding no error where trial court gave the limiting instruction during the jury charge, even though "it may have been better if the court had given the instruction immediately following the Evid.R. 404(B) testimony and also reiterated it in the charge to the jury.")

**{¶ 68}** Thus, in the case before us, the trial court did not err in failing to give the instruction at the time A.G. testified. Again, the trial court did give a limiting instruction, and we presume that the jury followed the instruction.

**{¶ 69}** Furthermore, when the Evid.R. 404(B) objection was made, Landers only asked that "the Court issue a brief cautionary instruction either at this time or after the testimony is rendered; just simply tracking the language of 404(B)." Transcript of Proceedings, Vol. I, p. 24. The court's action, therefore, was consistent with Landers' request. *See State v. Robinson*, 6th Dist. Lucas No. L-10-1369, 2012-Ohio-6068, ¶ 66 (noting that "Ohio law does not require the trial court to issue contemporaneous limiting instructions where none are requested.").

**{¶ 70}** Based on the preceding discussion, we conclude that the trial court did not abuse its discretion in admitting evidence under Evid.R. 404(B). The evidence in question met the criteria for admission. Furthermore, the trial court did not err in failing to give the jury a limiting instruction at the time the evidence was presented. Landers did not request a contemporaneous instruction, and the court properly provided limiting instructions during the jury charge. Accordingly, the First Assignment of Error is overruled.

III.   Dismissal of Attempted Rape Charge

{¶ 71} Landers' Second Assignment of Error states that:

The Trial Court Erred, and Thereby Deprived Landers of His Right to a Fair Trial Under the United States and Ohio Constitutions, When It Granted the State's Motion to Dismiss Count IV After Its Case in Chief.

{¶ 72} Under this assignment of error, Landers contends that the trial court deprived him of a fair trial by letting the State dismiss the charge of Attempted Rape (Count IV) after the State rested its case in chief.   At the time, Landers asked the court to deny the State's motion or to include a lesser included offense instruction on Attempted Rape in connection with Count III.   The court refused and dismissed Count IV.   Then, at Landers' request, the court dismissed Count IV with prejudice.

{¶ 73} According to Landers, the trial court erred by removing an option for the jury to convict him of a lesser charge.   In this vein, Landers points to evidence that A.G. did not tell the examining doctor or her mother that she had been anally raped, and that A.G.'s testimony varied regarding the anal rape.

{¶ 74} In Court III, Landers was charged with having committed Rape in violation of R.C. 2907.02(A)(1)(b), and in Court IV, Landers was charged with having engaged in conduct that, if successful, would have resulted in Rape, in violation of R.C. 2907.02(A)(1)(b).   There was no dispute that these charges involved anal Rape and Attempted anal Rape.   Transcript of Proceedings, Vol. II, p. 257.

{¶ 75} R.C. 2907.02(A)(1)(b) states, in pertinent part, that:

No person shall engage in sexual conduct with another who is not

the spouse of the offender or who is the spouse of the offender but is living separate and apart from the offender, when any of the following applies:

* * *

(b) The other person is less than thirteen years of age, whether or not the offender knows the age of the other person.

{¶ 76} R.C. 2923.02(A) (Attempt) provides that "[n]o person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct that, if successful, would constitute or result in the offense." R.C. 2923.02(E)(1) further provides that "[w]hoever violates this section is guilty of an attempt to commit an offense."

{¶ 77} "Sexual conduct" is defined by R.C. 2907.01(A) as "vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another." This statute further provides that "[p]enetration, however slight, is sufficient to complete vaginal or anal intercourse."

{¶ 78} The Supreme Court of Ohio has held that "there is sufficient evidence of anal intercourse, for purposes of the crime of anal rape under R.C. 2907.02, where the trier of fact finds that the defendant penetrated, however slightly, the victim's anus with any part of the defendant's body, or with any instrument, apparatus, or other object. If the evidence shows that the defendant made contact only with the victim's buttocks, there is not sufficient evidence to prove the defendant guilty of the crime of anal rape. As a corollary, where the evidence shows that the defendant attempts to penetrate the victim's

anus, and, for whatever reason, fails to do so and makes contact only with the buttocks, there is sufficient evidence to prove the defendant guilty of the crime of attempted anal rape." *State v. Wells*, 91 Ohio St.3d 32, 34, 740 N.E.2d 1097 (2001).

{¶ 79} We have carefully reviewed A.G.'s testimony, and there is no indication of an attempted anal rape, rather than an anal rape. Rather than describing an attempt, A.G.'s testimony indicates that penetration occurred. *See* Transcript of Proceedings, Vol. I, pp. 60-62 (indicating that Landers' penis went "in" her "butt" and went into her "butthole," but not all the way); pp. 70-71 (she yelled after he put his penis in her "butthole"); pp. 80-81 (he put his penis inside her anus and she yelled out; his penis was actually in her anus at that time but it was not in there all the way); and p. 88 (his penis was "in her butt," but not all the way).[2]

{¶ 80} It is true that A.G. did not tell her mother about the anal rape, nor did she report it to Dr. Matre at the hospital. However, Dr. Matre stated that it is common for children to disclose sexual abuse gradually; sometimes they will come in with one complaint and later something else will surface. Dr. Matre also did not find any trauma to the anus. However, Dr. Matre, who had 37 years of experience in this area, stated that he had received histories of anal penetration before, and did not usually find any physical findings. The anal swabs also contained a partial Y (male) chromosome from which Landers' DNA profile could not be excluded.

{¶ 81} As a result, we find no error in the fact that the trial court granted the State's request to dismiss the charge in Count IV for attempted anal Rape. The State conceded

---

[2] A.G. was cross-examined about her testimony at the prior trial, where she said that Landers' penis was inside her "all the way." Transcript of Proceedings, Vol. I, p. 82.

that it could not prove an attempt, and this was true.

{¶ 82} Accordingly, the Second Assignment of Error is overruled.

IV.  Motion for a Lesser Included Instruction

{¶ 83} Landers' Third Assignment of Error states that:

The Trial Court Erred When It Overruled Defendant's Motion for a

Lesser Included Instruction.

{¶ 84} Under this assignment of error, Landers argues that he was entitled to a lesser included instruction on Attempted Rape.   Landers relies on the same factors that he discussed in connection with the Second Assignment of Error.

{¶ 85} "The question of whether a particular offense should be submitted to the finder of fact as a lesser included offense involves a two-tiered analysis." (Citation omitted.)  *State v. Deanda*, 136 Ohio St.3d 18, 2013-Ohio-1722, 989 N.E.2d 986, ¶ 6. "The first tier, also called the 'statutory-elements step,' is a purely legal question, wherein we determine whether one offense is generally a lesser included offense of the charged offense."  *Id.*, citing *State v. Kidder*, 32 Ohio St.3d 279, 281, 513 N.E.2d 311 (1987).

{¶ 86} There is no dispute about the fact that Attempted Rape is a lesser included offense of Rape.   *See, e.g., State v. Williams*, 74 Ohio St.3d 569, 578, 660 N.E.2d 724 (1996).   Thus, the first tier is satisfied.

{¶ 87} "The second tier looks to the evidence in a particular case and determines whether ' "a jury could reasonably find the defendant not guilty of the charged offense, but could convict the defendant of the lesser included offense." ' "   *Deanda* at ¶ 6, quoting *State v. Evans*, 122 Ohio St.3d 381, 2009-Ohio-2974, 911 N.E.2d 889, ¶ 13. (Other

citation omitted.) "Only in the second tier of the analysis do the facts of a particular case become relevant." *Id.* "In determining whether lesser-included-offense instructions are appropriate, 'the trial court must view the evidence in the light most favorable to the defendant.' " *State v. Wine*, 140 Ohio St.3d 409, 2014-Ohio-3948, 18 N.E.3d 1207, ¶ 21, quoting *State v. Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, 827 N.E.2d 285, ¶ 37.

**{¶ 88}** In this part of his brief, Landers contends that A.G. testified that Landers only "tried" to put his penis in her butt. Brief of Appellant, p. 10, citing Transcript of Proceedings, Vol. I, p. 60. This testimony occurred at the beginning of A.G.'s description of the anal rape, and was as follows:

> A: What happened after that is he told me to bend over. And I was like on the bed so I was like laying on my stomach and I guess you could say my butt was in the air. And he tried to put his penis in my butt and I yelled. And I told him *to take it out* because I didn't like it.

(Emphasis added.) Transcript of Proceedings, Vol. I, p. 60.

**{¶ 89}** The clear inference from this testimony is that Landers' penis was inside A.G.'s anus. Otherwise, there would have been no reason for her to tell him "to take it out." Furthermore, as A.G. continued to describe the anal rape, her statements are completely clear that Landers' penis penetrated her anus.

**{¶ 90}** Thus, even construing the evidence in Landers' favor, there was simply no basis for an instruction on the lesser included offense of Attempted Rape. Accordingly, the Third Assignment of Error is overruled.

## V.   Manifest Weight Challenge

{¶ 91} Landers' Fourth Assignment of Error states that:

The Conviction on Count III Was Against the Manifest Weight of the Evidence.

{¶ 92} Under this assignment of error, Landers contends that his conviction is against the manifest weight of the evidence because A.G. did not initially report that he had anally raped her.   Landers again relies on the fact that A.G.'s testimony was allegedly contradictory.

{¶ 93} "A weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive."   (Citation omitted.)   *State v. Cassell*, 2d Dist. Clark No. 09CA0064, 2011-Ohio–23, ¶ 46.   When a conviction is challenged on appeal as being against the manifest weight of the evidence, " '[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' "   *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 94} "The credibility of the witnesses and the weight to be given to their testimony are matters for the trier of facts to resolve."   *Cassell* at ¶ 48, citing *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967).   "Because the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires

that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness." *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (August 22, 1997).

{¶ 95} "Contrastingly, the decision as to which of several competing inferences, suggested by the evidence in the record, should be preferred, is a matter in which an appellate judge is at least equally qualified, by reason and experience, to venture an opinion. Therefore, although this distinction is not set forth in *Thompkins, supra*, we conclude that a decision by a factfinder as to which testimony to credit, and to what extent, is a decision that is entitled to greater deference than the decision as to how much logical force to assign an inference suggested by that evidence-in short, how persuasive it is." *Id.*

{¶ 96} As was noted, A.G.'s testimony was not inconsistent, and indicated that Landers had committed Rape as charged in Count III. The Supreme Court of Ohio has stressed that "an accused in Ohio can be convicted on the uncorroborated testimony of the victim in substantially all criminal cases, including rape * * *." *State v. Economo*, 76 Ohio St.3d 56, 61, 666 N.E.2d 225 (1996). *Accord In re J.A.*, 2d Dist. Montgomery No. 23059, 2009-Ohio-2321, ¶ 14 (noting that "[c]orroboration of a rape victim's testimony is not required to support a guilty verdict, even when the victim is a child"). Instead, the victim's "testimony alone, if believed, is sufficient to prove beyond a reasonable doubt all of the essential elements of rape, including penetration." *J.A.* at ¶ 14.

{¶ 97} Furthermore, there was additional evidence supporting A.G.'s testimony. Although the DNA evidence was not as strong as in some cases – meaning that it did not

exclude all persons other than Landers, there was male DNA on the anal swab, and Landers could not be excluded as a contributor.

{¶ 98} As a result, we cannot say the conviction was against the manifest weight of the evidence. The Fourth Assignment of Error, therefore, is overruled.


VI. Jail Time Credit

{¶ 99} Landers' Fifth Assignment of Error states as follows:

The Trial Judge Erred by Telling Landers That He Could Earn Days of Credit.

{¶ 100} Under this assignment of error, Landers contends that the trial court erred by telling him that he might be eligible to earn jail credit pursuant to R.C. 2967.193, when he, in fact, was required to serve a mandatory prison term that cannot be reduced by earned days of credit.

{¶ 101} The State agrees that the opportunity to earn jail credit under R.C. 2967.193 is subject to the limitations in R.C. 2929.13(F), and that under R.C. 2929.13(F)(2), Landers is not permitted to earn such jail time credit due to his conviction for Rape. However, the State argues that this was harmless error that did not affect the outcome of the case.

{¶ 102} "[T]he plain language of R.C. 2929.13(F) requires the sentencing court to impose a prison term for certain serious offenses and limits that court's discretion to reduce that term pursuant to * * * R.C. 2967.193 (deduction for participation in certain prison programs) * * *." *State v. Johnson*, 116 Ohio St.3d 541, 2008-Ohio-69, 880 N.E.2d 896, ¶ 16. As a result, the trial court did err in informing Landers that he "may be

eligible to earn days of credit up to 8% of the sentence as specified in section 2967.193 of the Revised Code." Transcript of Proceedings, Vol. II, p. 355. The trial court repeated this incorrect statement in the sentencing entry.

{¶ 103} Crim.R. 52(A) states that "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." App.R. 12(B) also requires trial court judgments to be affirmed if there is no error prejudicial to appellants.

{¶ 104} In a somewhat similar context, where the sentences for two rape convictions were mandatory, we found that the trial court's erroneous reference to the fact that a prison sentence for one of the rapes was "presumed necessary," "was harmless beyond a reasonable doubt." *State v. Myers*, 2d Dist. Clark No. 2001-CA-40, 2002-Ohio-6196, ¶ 9. The same observation applies here. Since Landers was statutorily ineligible for earned credit, the trial court's comment, while erroneous, was harmless beyond a reasonable doubt. Accordingly, the Fifth Assignment of Error is overruled, but the trial court's judgment entry will be modified to indicate that Landers is not entitled to earn jail credit under R.C. 2967.193.


VII. Alleged Ineffective Assistance of Counsel

{¶ 105} Landers' Sixth Assignment of Error states that:

Landers Was Deprived of the Effective Assistance of Counsel at

Trial.

{¶ 106} Under this assignment of error, Landers contends that trial counsel was ineffective for two reasons: (1) counsel failed to request a contemporaneous limiting instruction when Evid.R. 404(B) testimony was presented to the jury; and (2) counsel

failed to object to Dr. Matre's testimony that A.G. was sexually abused, based on a reasonable degree of scientific certainty.

{¶ 107} In order to establish ineffective assistance of counsel, "the defendant must [first] show that counsel's performance was deficient.   This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.   Second, the defendant must show that the deficient performance prejudiced the defense.   This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

{¶ 108} "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.   Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' "   *Id.* at 689.   (Citation omitted.)   With these standards in mind, we will consider the two issues that Landers has raised.

## A.   Limiting Instruction

{¶ 109} As was noted, Landers' first argument is that trial counsel was ineffective by failing to request a limiting instruction at the time A.G. gave the testimony.   We have previously concluded that the trial court did not err in admitting this evidence, and that the

trial court was not required to give the instruction contemporaneously.

{¶ 110} In *State v. Tisdale*, 2d Dist. Montgomery No. 19346, 2003-Ohio-4209, we concluded that trial counsel did not render ineffective assistance where counsel failed to request any limiting instruction on the admission of evidence of prior acts under Evid.R 404(B). *Id.* at ¶ 48. We commented that while we had "recognized that a defendant is entitled to an appropriate instruction limiting the scope of a jury's consideration of potentially prejudicial evidence that is admitted for a very limited purpose, we have also recognized that a defendant may decide, as a matter of trial strategy, not to request a limiting instruction because of concerns that it will only emphasize in the juror's minds the evidence of other criminal acts committed by defendant to which the instruction applies, thereby reinforcing the prejudice." *Id.*, citing *State v. McDaniel,* 2d Dist. Clark No. 2853, 1992 WL 206759 (Aug. 19, 1992).

{¶ 111} In contrast to the counsel in *Tisdale*, Landers' counsel did ask for a limiting instruction and was, therefore, not even arguably ineffective on that basis. However, Landers' counsel did not assert that the trial court must provide the instruction at the time of A.G.'s testimony. This may have been a matter of trial strategy, in order not to emphasize the testimony in the jury's mind. It may also have been based on recognition that the trial court cannot be forced to give the instruction contemporaneously. In any event, we do not think counsel was ineffective. Counsel did object and ask for a limiting instruction. Counsel could not force the trial court to give the instruction then, and we will not judge counsel's actions in hindsight.

{¶ 112} Furthermore, Landers was acquitted of two of the three Rape charges, which indicates that Landers was not deprived of a fair trial. As was noted, with regard

to the only charge for which Landers was convicted, DNA evidence revealed the existence of male DNA on the anal swabs, and Landers could not be excluded as a contributor. There was some physical evidence with respect to the Rape charge based on digital penetration, i.e., the bruising on the area inside the labia, but the jury did not convict Landers for this charge, which lacked DNA evidence, as did the charge pertaining to the alleged fact that Landers put his penis in A.G.'s mouth.

## B. Dr. Matre's Opinion

{¶ 113} As was noted, Landers also argues that trial counsel was ineffective in failing to object to Dr. Matre's opinion. Specifically, Landers contends that Dr. Matre could not express an opinion on anal rape, since he was not informed of it and did not find any evidence of anal trauma. As support for this proposition, Landers cites *State v. Boston*, 46 Ohio St.3d 108, 545 N.E.2d 1220 (1989).

{¶ 114} In *Boston*, the Supreme Court of Ohio held that "an expert's opinion testimony on whether there was sexual abuse would aid jurors in making their decision and is, therefore, admissible pursuant to Evid.R. 702 and 704." *Id.* at 128.[3] S*ee also State v. Gersin,* 76 Ohio St.3d 491, 494, 668 N.E.2d 486 (1996).

{¶ 115} However, the court in *Boston* also concluded that the trial court had

---

[3] *Boston* was modified in part on other grounds by *State v. Dever*, 64 Ohio St.3d 401, 596 N.E.2d 436 (1992), which held that "[a] trial court does not abuse its discretion when it admits a child declarant's statements made for the purpose of medical diagnosis or treatment pursuant to Evid.R. 803(4), without first establishing the child declarant's unavailability to testify." *Id.* at paragraph one of the syllabus. *Dever* further held that "[s]tatements made by a child during a medical examination identifying the perpetrator of sexual abuse, if made for purpose of diagnosis and treatment, are admissible pursuant to Evid.R. 803(4), when such statements are made for the purposes enumerated in that rule." *Id.* at paragraph two of the syllabus.

prejudicially erred by allowing other statements by a physician, "which in effect, declared that [the child-victim] was truthful in her statements." *Boston* at 128*.* The court concluded that "an expert may not testify as to the expert's opinion of the veracity of the statements of a child declarant." *Id.* at 129. *Accord Gersin* at 493.

{¶ 116} Subsequently, the Supreme Court of Ohio stated that "*Boston's* syllabus excludes expert testimony offering an opinion as to the truth of a child's statements (*e.g.*, the child does or does not appear to be fantasizing or to have been programmed, or is or is not truthful in accusing a particular person). It does not proscribe testimony which is additional support for the truth of the *facts testified to* by the child, or which assists the fact finder in assessing the child's veracity." (Emphasis sic.) *State v. Stowers*, 81 Ohio St.3d 260, 262-263, 690 N.E.2d 881 (1998).

{¶ 117} *Stowers* involved a clinical psychologist who testified about behaviors of sexually-abused children. In this regard, the court commented that:

[The psychologist's] testimony did not violate *Boston*, though it included an explanation that behaviors like recantation of accusations and delayed disclosure of incidents of sexual abuse are seen in children that have been sexually abused. [The psychologist] testified that even though the children changed their stories, her assessment that they had been abused did not change. Such testimony is permitted to counterbalance the trier of fact's natural tendency to assess recantation and delayed disclosure as weighing against the believability and truthfulness of the witness. This testimony "does not usurp the role of the jury, but rather gives information to a jury which helps it make an educated determination."

*Stowers* at 263, quoting *Gersin,* 76 Ohio St.3d at 494, 668 N.E.2d 486.

**{¶ 118}** The court also stated in *Stowers* that "Evid.R. 704 provides that opinion evidence is not objectionable solely because it embraces an ultimate issue of fact." *Id.* at 261. We have also stressed that "[w]hat an expert may not do is offer a direct opinion on whether a child is telling the truth*." State v. Rosas*, 2d Dist. Montgomery No. 22424, 2009-Ohio-1404, ¶ 42, citing *Boston*, 46 Ohio St.3d 108, 545 N.E.2d 1220, at syllabus.

**{¶ 119}** Dr. Matre did not offer a direct opinion on whether A.G. was telling the truth. As an initial matter, when Dr. Matre examined A.G., there were no allegations regarding anal rape. The allegations at that point were digital manipulation in the vaginal area and that someone had made A.G. "suck on his penis." Transcript of Proceedings, Vol. I, p. 243.

**{¶ 120}** Dr. Matre's examination disclosed bruising in the upper right vestibule, which is the area just inside the labia. Dr. Matre stated that this localized bruising was consistent with digital manipulations in the vaginal area, and there was no history of any other injury that would have caused the bruising. He therefore, concluded, within a reasonable degree of scientific certainty, that A.G.'s injury was "consistent with her history, so it was sexual abuse." *Id.* at 244.

**{¶ 121}** In *Rosas*, the appellant argued that a psychologist's testimony had impermissibly bolstered a child victim's credibility, and had improperly invaded the province of the jury. *Rosas* at ¶ 42. However, we disagreed. We noted the distinction " 'between expert testimony that a child witness is telling the truth,' " and " 'evidence which bolsters a child's credibility insofar as it supports the prosecution's efforts to prove that a child *has* been abused.' " (Emphasis sic.) *Id.*, quoting *Stowers*, 81 Ohio St.3d at 262,

690 N.E.2d 881.   We then stated that:

> Here, Dr. Micelli's testimony is within permissible bounds. She testified about the behavioral characteristics of sexually abused children. She then compared these characteristics to A.V.'s behavior and offered her opinion that A.V. had been sexually abused.   Dr. Micelli never directly testified that she believed what A.V. had said or that she thought A.V. was a credible witness.

{¶ 122} There is very little distinction between the above comments and Dr. Matre's opinion, based on his examination, that A.G. had been sexually abused.   Like the expert in *Rosas*, Dr. Matre never directly stated that he believed what A.G. had said or that he thought A.G. was credible as a witness.   Accordingly, trial counsel was not ineffective when he failed to object to this testimony.

{¶ 123} Furthermore, as the State points out, Dr. Matre's observation related to the digital penetration of A.G.'s vagina.   The jury found Landers not guilty of that crime.

{¶ 124} Based on the preceding discussion, the Sixth Assignment of Error is overruled.


VIII.   Conclusion

{¶ 125} All of Landers' assignments of error having been overruled, the judgment of the trial court is affirmed, with the exception that the judgment is modified to indicate that Landers is not entitled to earn jail credit under R.C. 2967.193.

. . . . . . . . . . . . .

HALL, P.J. and DONOVAN, J., concur.

Copies mailed to:

Nathaniel R. Luken
Robert Alan Brenner
Hon. Michael A. Buckwalter