[Cite as *State v. Hammad*, 2014-Ohio-3638.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

STATE OF OHIO                          :

    Plaintiff-Appellee                 :              C.A. CASE NO.    26057

v.                                     :              T.C. NO.    13CR1625

MAJDI HAMMAD                           :              (Criminal appeal from
                                                      Common Pleas Court)

    Defendant-Appellant                :

                                       :

. . . . . . . . . .

**O P I N I O N**

Rendered on the ____22nd____ day of ____August____, 2014.

. . . . . . . . . .

MICHELE D. PHIPPS, Atty. Reg. No. 0069829, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellee

ELIZABETH C. SCOTT, Atty. Reg. No. 0076045, 120 W. Second Street, Suite 603, Dayton, Ohio 45402
    Attorney for Defendant-Appellant

. . . . . . . . . .

DONOVAN, J.

    **{¶ 1}** Defendant-appellant Majdi Hammad appeals his conviction and sentence for

one count of felonious assault (deadly weapon), in violation of R.C. 2903.11(A)(2), a felony of the second degree. Hammad filed a timely notice of appeal with this Court on January 17, 2014.

{¶ 2} The incident which forms the basis for the instant appeal occurred on May 30, 2013, when Abbel Rents was scheduled to erect an outdoor tent for a wedding at 1231 Hooks Estate Drive (hereinafter "Hooks Estate") located in Dayton, Ohio. Hammad, who was employed by Abbel, traveled to Hooks Estate with the owner, Carolyn Martin, and several other employees. En route to Hooks Estate, Carolyn[1] noticed that Hammad seemed irritable. Carolyn testified that she asked Hammad what was wrong, but he did not answer.

{¶ 3} Upon arriving at Hooks Estate late in the afternoon on May 30, 2013, the employees began unloading the tent in order to set it up. Carolyn's husband, Ben Martin, was already at the site when she arrived with the employees. Ben had arrived at the site at approximately 3:30 p.m. As the crew began erecting the tent, Carolyn observed that Hammad was not helping and kept walking back to one of the Abbel trucks to get water. When Carolyn approached Hammad and told him that he needed to get to work, he ignored her. Carolyn testified that she did not use any obscene language or racial slurs when she asked him to start working. Carolyn informed Ben that Hammad was not working and that he was ignoring her. Ben asked Hammad if he had heard what Carolyn said. At that point Hammad became very angry. Hammad threw the water he had been drinking at Ben and took off his Abbel uniform shirt and dropped it on the ground. Hammad also began cursing at Carolyn and calling her obscene names. Carolyn ordered Hammad to leave the site.

---

[1]We utilize first names when necessary for clarity.

Ultimately, Carolyn called 9-1-1 at approximately 7:00 p.m. Officer Jordan Alexander from the Dayton Police Department arrived shortly thereafter and escorted Hammad away from Hooks Estate. Officer Alexander did not arrest Hammad at that time, but rather dropped him off at a nearby intersection where he said someone was coming to get him. After Hammad left with the police, Carolyn, Ben, and the remaining Abbel employees went back to work.

{¶ 4} Approximately two hours later, Hammad returned to Hooks Estate and immediately began behaving in a very belligerent manner. Almost immediately upon returning, Hammad began shouting obscenities at Carolyn and Ben. Carolyn testified that Hammad picked up a folding chair and began swinging it at her head. Before she could be hit with the chair, Carolyn testified that she ran away. Hammad then dropped the chair on the ground and picked up a ten to twelve pound sledgehammer that was being used to pound large tent stakes into the ground. Carloyn testified that at this point, Hammad swung the sledgehammer over his shoulder and announced his intention to use the sledgehammer to knock the entire tent down. Hammad then walked over to the tent stakes and began striking them with the sledgehammer, stating that he was going to take the whole tent down. Carolyn testified that she yelled at him to stop damaging the tent. Hammad stopped hitting the tent stakes and turned his attention to Carolyn. As he walked toward Carolyn, she testified that Hammad told her, "I'm going to kill you, white b****." When Hammad was approximately six to seven feet away from Carolyn, the other Abbel employees managed to get between them and form a wall to protect her. Eventually, some of the Abbel employees were also able to persuade Hammad to stop his pursuit of Carolyn.

{¶ 5} Carolyn called 9-1-1 again. While she was speaking with the 9-1-1 operator, Hammad apparently dropped the sledgehammer, walked over to an Abbel van, and kicked it. At approximately 9:20 p.m., Officer Philip Adams arrived at Hooks Estate to investigate the second 9-1-1 call. Officer Adams testified that he observed that Hammad was very agitated and yelling obscenities. After Carolyn spoke to Officer Adams, he arrested Hammad, handcuffed him, and placed him in his cruiser. Hammad was still very agitated and continued to call Carolyn obscene names. While being transported to the jail, Hammad called Officer Adams names, using racial slurs. We note that the testimony adduced at trial, with the exception of Hammad's, established that neither Carolyn nor Ben used obscene language or cursed during the confrontation at Hooks Estate.

{¶ 6} Hammad was indicted on June 26, 2013, for two counts of felonious assault with a deadly weapon. Count I of the indictment referred to the felonious assault against Carolyn Martin, while the second count referred to Ben Martin. The case was tried to a jury in early November of 2013. The jury found Hammad not guilty on Count II, but the jury could not reach a verdict on Count I. On December 16, 2013, a second jury trial was held. On December 18, 2013, the jury returned a verdict finding Hammad guilty of felonious assault with a deadly weapon. At the sentencing hearing on December 20, 2013, the trial court sentenced Hammad to prison for two years.

{¶ 7} It is from this judgment that Hammad now appeals.

{¶ 8} Because they are interrelated, Hammad's first and second assignments of error will be discussed together as follows:

{¶ 9} "MR. HAMMAD'S CONVICTION IS AGAINST THE WEIGHT OF THE EVIDENCE."

{¶ 10} "THE EVIDENCE PRESENTED BY THE STATE WAS INSUFFICIENT TO CONVICT MR. HAMMAD."

{¶ 11} In his first assignment, Hammad contends that his conviction for felonious assault with a deadly weapon is against the manifest weight of the evidence. In his second assignment, Hammad argues that the evidence adduced by the State was insufficient to find him guilty of the charged offense.

{¶ 12} "A challenge to the sufficiency of the evidence differs from a challenge to the manifest weight of the evidence." *State v. McKnight*, 107 Ohio St.3d 101,112, 2005-Ohio-6046, 837 N.E.2d 315. "In reviewing a claim of insufficient evidence, '[t]he relevant inquiry is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' (Internal citations omitted). A claim that a jury verdict is against the manifest weight of the evidence involves a different test. 'The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" *Id*.

{¶ 13} The credibility of the witnesses and the weight to be given to their testimony are matters for the trier of facts to resolve. *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967). "Because the factfinder * * * has the opportunity to see and hear the

witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness." *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997).

{¶ 14} This court will not substitute its judgment for that of the trier of facts on the issue of witness credibility unless it is patently apparent that the trier of fact lost its way in arriving at its verdict. *State v. Bradley*, 2d Dist. Champaign No. 97-CA-03, 1997 WL 691510 (Oct. 24, 1997).

{¶ 15} Hammad was convicted of felonious assault with a deadly weapon in violation of R.C. 2903.11(A)(2), which states that "[n]o person shall knowingly *** cause or attempt to cause physical harm to another *** by means of a deadly weapon or dangerous ordnance."

{¶ 16} With the foregoing standards in mind, we conclude that the evidence adduced at trial established all of the elements necessary to sustain Hammad's conviction for felonious assault with a deadly weapon. Carolyn testified that after Hammad returned to Hooks Estate after being escorted away by Officer Alexander, he picked up a sledgehammer and began striking the tent stakes, with the stated intent of bringing the tent down. Carolyn further testified that she yelled at him to stop damaging the tent. Hammad stopped hitting the tent stakes and turned his attention to Carolyn. As he walked toward Carolyn, she testified that Hammad told her, "I'm going to kill you, white b****." Based on Hammad's

actions, Carolyn testified that she believed he intended to seriously harm her. Ben testified that if Carolyn had not been able to evade Hammad while he was wielding the sledgehammer, he would have killed her. When Hammad was approximately six to seven feet away from Carolyn, the other Abbel employees managed to get between them and form a wall to protect her.

{¶ 17} Although the determination of whether a substantial step has been taken toward the commission of felonious assault is a factual one, it is not dependent on the subjective impressions of the victim. *State v. Abdoulaye*, 2d Dist. Montgomery No. 20050, 2004-Ohio-5825, ¶ 15. Furthermore, we note that a criminal attempt is a purposeful act or omission which constitutes a substantial step in a course of conduct planned to culminate in his commission of the crime. *Id*. at ¶ 13, citing *State v. Woods*, 48 Ohio St.2d 127, 357 N.E.2d 1059 (1976). "To constitute a substantial step, the conduct must be strongly corroborative of the actor's criminal purpose." *Id*. In *State v. Brooks*, 44 Ohio St.3d 185, 542 N.E.2d 636 (1989), the Ohio Supreme Court concluded that drawing a firearm and threatening to kill constituted an attempt. In that case, the victim and the defendant had become embroiled in an argument at a bar. The defendant "suddenly drew a revolver and angrily told [the victim] that he would kill her." The court held that, under those circumstances, a reasonable jury could have "concluded that the defendant's actions were 'strongly corroborative' of his intent to cause physical harm to [the victim] by means of his deadly weapon." *Id*. at 192.

{¶ 18} In the instant case, Hammad's conduct consisting of carrying a sledgehammer over his shoulder as if preparing to swing it, walking toward Carolyn in an

aggressive manner, and stating, "I'm going to kill you, white b****," was "strongly corroborative" of his intent to cause physical harm to the victim by means of his deadly weapon. Thus, a review of the record convinces us that the State's evidence, taken in its entirety, was sufficient to sustain Hammad's conviction for felonious assault with a deadly weapon.

{¶ 19} Moreover, having reviewed the record, we find no merit in Hammad's manifest-weight challenge. It is well settled that evaluating witness credibility is primarily for the trier of fact. *State v. Benton*, 2d Dist. Miami No. 2010-CA-27, 2012-Ohio-4080, ¶ 7. A trier of fact does not lose its way and create a manifest miscarriage of justice if its resolution of conflicting testimony is reasonable. *Id.* Here the jury quite reasonably could have credited Carolyn and Ben's testimony that Hammad intended to strike her with the sledgehammer. Accordingly, the jury did not lose its way and create a manifest miscarriage of justice in reaching a guilty verdict.

{¶ 20} Hammad's first and second assignments of error are overruled.

{¶ 21} Hammad's third and final assignment of error is as follows:

{¶ 22} "MR. HAMMAD'S COUNSEL WAS INEFFECTIVE."

{¶ 23} In his final assignment of error, Hammad argues that his trial counsel was ineffective for failing to meaningfully address any prejudice or biases the jury might have related to his middle-eastern heritage.

{¶ 24} "We review the alleged instances of ineffective assistance of trial counsel under the two prong analysis set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and adopted by the Supreme Court of Ohio in *State v. Bradley*

(1989), 42 Ohio St.3d 136, * * * . Pursuant to those cases, trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. *Strickland*, 466 U.S. at 688. To reverse a conviction based on ineffective assistance of counsel, it must be demonstrated that trial counsel's conduct fell below an objective standard of reasonableness and that his errors were serious enough to create a reasonable probability that, but for the errors, the result of the trial would have been different. *Id.* Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel." (Internal citation omitted). *State v. Mitchell*, 2d Dist. Montgomery No. 21957, 2008-Ohio-493, ¶ 31.

{¶ 25} In *State v. Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, 873 N.E.2d 828, the Supreme Court of Ohio addressed claims of ineffective assistance of counsel during voir dire. The Court stated that "trial counsel is entitled to exercise broad discretion in formulating voir dire questions." *Id.* at ¶ 84. Furthermore, the Supreme Court wrote, at ¶ 63-64:

We have consistently declined to "second-guess trial strategy decisions" or impose "hindsight views about how current counsel might have voir dired the jury differently."

"Few decisions at trial are as subjective or prone to individual attorney strategy as juror *voir dire*, where decisions are often made on the basis of intangible factors." "The selection of a jury is inevitably a call upon experience and intuition. The trial lawyer must draw upon his own insights

and empathetic abilities. Written records give us only shadows for measuring the quality of such efforts. * * * [T]he selection process is more an art than a science, and more about people than about rules." For these reasons, we have recognized that "counsel is in the best position to determine whether any potential juror should be questioned and to what extent." (Citations omitted.)

{¶ 26} Contrary to the assertions made by Hammad, a cursory review of the record establishes that his trial counsel directly addressed the issue of any potential bias regarding his middle eastern ethnicity during voir dire. Specifically, defense counsel made the following statements regarding his client's middle eastern heritage during voir dire:

Now, Mr. Hammad is from the Middle East. Because of that there's – there's been some things in the news, probably the past ten, fifteen years about individuals from the Middle East. Now, just because he's from the Middle East, does anybody here necessarily think that Mr. Hammad would be predisposed to violence?

Predisposed to activities that may cause someone to have injury?

We'll move in further. Imagine we're going to the airport. Okay? We're taking a group trip. Miami, Florida.

Get on the airplane, see four Middle Eastern men get on the airplane before us. How many of you would have concerns about seeing that particular situation? Nobody? Nobody would be concerned about that?

Does anyone think that because Mr. Hammad is from the Middle East,

that may be synonymous with a terrorist or the Taliban.

Or any organization that – that may have its roots and funding and causing problems and causing injury?

\*\*\*

Now, if you thought that Mr. Hammad might have some tendencies toward violence just because of his background, that doesn't make you a bad person neither [sic]. Not at all. It just – maybe this is not the trial for you. Maybe you have experiences; maybe you've had things you've gone through that – that make you think, well, maybe that – that, you know, I kind of connect those two.

I don't know if any one of you would have been in New York City during 9-11. If in fact that's the circumstance and you told me you had a problem, I'm like, well, yeah. I imagine I bet you do, but that's not part of this group's experiences.

The State: Jay. Jay, you've got a hand.

Defense Counsel: Oh. I'm sorry. I'm sorry. I can get this. [Prospective Juror #11]?

Prospective Juror #11: Yeah.

Q: Thank you.

A: I was part of 9-11. I was in the fourth grade, though.

Q: Oh. Wow.

A: So, that is a different impact versus me being twenty-two now.

Q: Yes.

A: I do not associate that with him at all. I do not. I associate that with being a racial situation as far as I'm being. Also, I'm black. I would never want somebody to think just because somebody did that that I would. So, I don't associate that with him at all. But, yes. I was involved in that.

Q: Did you live in New York?

A: Yes. I'm from the Bronx.

Q: Oh. From the Bronx.

A: Uh-huh.

***

Q: Any of your family members involved in 9-11?

A: Yes. My uncle was. Police officer for NYPD. Yes.

Q: Okay.

A: And that entire week, he was gone.

Q: Okay.

A: And came home with debris everywhere. I heard of that.

Q: Oh. And you were in the fourth grade?

A: Yes.

Q: Well, interesting perspective.

{¶ 27} It is clear from the above exchange that trial counsel thoroughly discussed the issue of racial prejudice regarding Hammad's middle eastern heritage with the potential jury. Only Prospective Juror #11 raised her hand. In fact, the gist of Prospective Juror

#11's responses illustrate as a minority herself she would not be biased upon race or ethnicity. Therefore, Hammad has failed to establish that his trial counsel was ineffective based on his performance during voir dire. Accordingly, there is no basis on which to find that trial counsel's representation fell below an objective standard of reasonableness.

{¶ 28} Hammad's third and final assignment of error is overruled.

{¶ 29} All of Hammad's assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . .

FROELICH, P.J. and HALL, J., concur.


Copies mailed to:

Michele D. Phipps
Elizabeth C. Scott
Hon. Mary Katherine Huffman