[Cite as *State v. Johnson*, 2021-Ohio-1974.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
GREENE COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 2020-CA-41 |
| | : | |
| v. | : | Trial Court Case No. 2019-CR-861 |
| | : | |
| DAVID L. JOHNSON | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 11th day of June, 2021.

. . . . . . . . . . .

MARCY A. VONDERWELL, Atty. Reg. No. 0078311, Assistant Prosecuting Attorney, Greene County Prosecutor's Office, Appellate Division, 61 Greene Street, Suite 200, Xenia, Ohio 45385
       Attorney for Plaintiff-Appellee

P.J. CONBOY, Atty. Reg. No. 0070073, 5613 Brandt Pike, Huber Heights, Ohio 45424
       Attorney for Defendant-Appellant

. . . . . . . . . . . .

DONOVAN, J.

{¶ 1} David L. Johnson ("Johnson") appeals from his conviction, following a jury trial, for one count of trespass in a habitation when a person is present or likely to be present, in violation of R.C. 2911.12(B), a felony of the fourth degree. He was sentenced to 18 months in prison, and the court imposed a fine of $3,500. We will affirm the judgment of the trial court.

{¶ 2} On December 2, 2019, an order of protection was issued in favor of Jennifer Johnson ("Jennifer"), Johnson's ex-wife, in Fairborn Municipal Court. Johnson was arrested for trespass on the same day, and he posted bond two days later.

{¶ 3} Johnson was indicted on December 13, 2019, and he pled not guilty; he was released on an own recognizance bond. On January 29, 2020, he filed a motion for intervention in lieu of conviction, and on February 26, 2020, the court ordered that Johnson be examined by a licensed independent chemical dependence counselor to determine if he met the criteria set forth in R.C. 2951.04 "in regards to mental illness, intellectual disability or drug or alcohol use."

{¶ 4} On May 13, 2020, the probation department filed a motion for violation of bond and a request for a capias, alleging that Johnson had failed to report. The court granted the motion, set aside Johnson's previous bond, and established a new bond of $25,000.

{¶ 5} On May 28, 2020, the court tolled Johnson's speedy trial time due to the COVID-19 pandemic. On June 1, 2020, Johnson's attorney filed a motion to modify his bond. The State opposed the motion, noting that Johnson had violated his bond conditions by failing to report to the probation department and also had been charged with operating a vehicle while under the influence and failure to control in Fairborn

Municipal Court on March 16, 2020.   The court denied the motion for bond modification. On August 4, 2020, the court denied Johnson's motion for intervention in lieu of conviction.

{¶ 6} On October 6, 2020, shortly before trial, the State requested an additional jury instruction on the element of "force."   On October 9, 2020, Johnson filed a motion in limine to exclude evidence of his prior conviction for making false alarms; he also filed proposed jury instructions.   On October 12, 2020, the State opposed Johnson's liminal motion.

{¶ 7} The trial commenced on October 12, 2020.   Johnson made an oral motion to dismiss at an in-chambers conference prior to voir dire, and the court denied the motion.

{¶ 8} Lauren, the Johnsons' daughter, who was nine years old at the time of trial, testified that she, her brother Aidan, and her mother resided on Ridgecrest Court in Fairborn.   She stated that, on November 24, 2019, she, Aidan, and her mother were in the backyard of their home; after jumping on their trampoline, Lauren went inside to take a shower in her mother's bathroom.   She stated that the overhead garage door was open at the time, and that she entered the garage and then entered the home through the interior garage door.   Lauren testified that to gain entrance to the home, she turned the knob on the door and pushed it open, and that she closed the door behind her, but left it unlocked, because her mother and brother were still outside.   Lauren stated that the front door of the home had a keypad for entry, and two other doors at the rear of the home were kept locked.

{¶ 9}   Lauren stated that, when she got out of the shower, she thought she heard

her brother's voice. She testified that she was surprised to observe Johnson walking into her mother's bedroom. She stated that she was wrapped in a towel, and her father told her to get dressed, which she did in the bathroom. Lauren stated that her father sat on her mother's bed and spoke to the cat.

{¶ 10} Lauren testified that she asked her father why he was there, and he told her that he brought the mail from outside, and he had mail in his hand. Johnson then said, "I got to go." She testified that Johnson stated that he had thought the family was not home, but the garage door was open. Lauren testified that, at the time, her mother's and brother's cars were in the driveway. Lauren stated that Johnson told her to close the overhead garage door; when she responded that her mother and brother were still in the yard, Johnson yelled at her to close the garage door, and she did so. Lauren stated that Johnson left the mail at the top of the stairs and left the home. Lauren then told her mother that her father had been there. Lauren stated that Johnson had wanted a flash drive from her mother, and that he subsequently returned to their home that day to retrieve it. Lauren stated that she had not seen her father in 18 months prior to this occasion, and she never showed him around the home. Lauren identified photos of her home.

{¶ 11} Aidan Johnson, age 16, stated that his family, including his father, had lived on Ortego Drive until his parents' divorce. Aidan testified that he had not seen his father in the year prior to the incident at issue. He stated that, on November 24, 2019, he and his mother were doing yard work in the backyard, and Lauren was playing on their trampoline. He stated that he and his mother had been outside for two to three hours. Aidan testified that after Lauren went inside, he heard the family dogs barking and proceeded to the house. As he approached the home, Aidan observed his father's silver

Jeep leaving their cul de sac. He stated that he went to the garage door, where Lauren was standing. Upon learning that his father had been inside their home, Aidan told his mother, who immediately went to find out what had happened from Lauren.

{¶ 12} Aidan further testified that his mother called the police, but that they did not immediately respond. Aidan testified that, after 30 minutes, Johnson came back to the house and was knocking on the door; his mom, who was on the phone with the police, thought the police were at the door and opened it a little bit, seeing Johnson. Aidan stated that his mother slammed the door. Aidan stated that his father "stayed for little bit and then left." He also identified photos of the home.

{¶ 13} Jennifer Johnson testified that her and Johnson's divorce was final in August 2018. She testified that, on the morning of November 24, 2019, around 8:00 a.m., she received and silenced a phone call from Johnson on her cell phone because she and the children were still in bed. She stated that the doorbell rang repeatedly a few minutes later. Jennifer testified that she proceeded to the door and opened it a little bit, observed Johnson, and asked him what he wanted; Johnson said he was there to pick up a flash drive pursuant to a court order to transfer photos to Jennifer. Jennifer advised Johnson that she had left the flash drive in his mailbox the day before. Jennifer testified that Johnson then asked to see the kids, but she told him they were asleep, told him to leave, and shut the door.

{¶ 14} Jennifer stated that, later, she and her children were in the backyard in the early afternoon for a couple of hours until Lauren went inside to shower. She stated that, 30 minutes later, Aidan asked, "Isn't that dad?" Jennifer looked up and saw Johnson in his silver Jeep pulling away from the curb. Jennifer stated that Johnson had not advised

her in the morning that he planned to return that day, and that he had not been invited to come back; she had asked him to leave. Jennifer testified that she had told Aidan to close the garage door because she did not "want to take a chance that he would try to come into the house." According to Jennifer, Aidan returned a minute or so later and told Jennifer that Lauren had said Johnson had been in the house. Jennifer then ran to the house, saw that the overhead garage door was closed, and entered the home through the front door to ask Lauren what had happened.

{¶ 15} Jennifer testified that Johnson previously had been inside the home once or twice, only in the foyer, "numerous months earlier." She stated that the children knew not to let Johnson in the home. Jennifer stated that she phoned Johnson's cell and left a message "reinforcing that he had no right to be in [her] house" and should never come back.

{¶ 16} Jennifer stated that she called 911 and was told officers would respond; 20 to 25 minutes later her doorbell rang, and she opened the door, believing it was the police officers. She stated that Johnson tried to hand a flash drive to her, and she slammed the door. She also testified stated that Johnson tried to jiggle the handle to open the door, but it was locked. Jennifer testified that she called 911 again, and the dispatcher remained on the phone with her until officers arrived. Jennifer identified photos of her home and a photo of a call log from her cell phone. Her initial 911 call was played for the jury.

{¶ 17} Detective Alan Kraker of the Fairborn Police Department received the case for follow up on Monday, November 25, 2019. Kracker stated that he spoke to Johnson on November 26, 2019, and advised him that there was a warrant for his arrest. He

stated that between November 26 and December 2, 2019, when Johnson was arrested, he and other officers had attempted unsuccessfully to locate him.

{¶ 18} Kraker interviewed Johnson at the Fairborn Police Department after his arrest, and Kraker identified a copy of the pre-interview form containing Johnson's *Miranda* rights and his initials and signature indicating his understanding of those rights. Kraker stated that Johnson acknowledged having been at the home; Johnson told Kraker that Lauren had answered the door, told him that Jennifer was not at home, and invited him in to wait for her return. Johnson told Kraker there was supposed to have been an exchange of a flash drive the day before at a karate class, but the class had been cancelled, and Johnson was just dropping off the flash drive. Kraker stated that Johnson told him he had never been inside the home, "so he toured the house"; Johnson denied Lauren's allegations that he had entered the bedroom as she exited the shower, and that he sat on the bed. According to Kraker, Johnson acknowledged that there had been two cars in the driveway and that he had been driving a silver Jeep. Kraker testified that Lauren and Aidan were interviewed by a forensic specialist at Michael's House in Fairborn, and that their versions of events there were consistent with what they originally reported to responding officers.

{¶ 19} Ben Schaefer, who was previously employed at the Fairborn Police Department, stated that on November 24, 2019, he was partnered with John Matheny, a more experienced officer; at about 6:00 p.m., they were dispatched to Jennifer's Ridgecrest Court address for "an unwanted subject." Schaefer stated that he spoke to Jennifer and the children and obtained their written statements; he also took photos of the house. Schaefer stated that Jennifer was very upset and "very kind of scared to be

in her own house."

{¶ 20} Officer Matheny testified that he and Schaefer were unable to respond to Jennifer's initial call due to being on other calls, and that Jennifer subsequently called again and reported that Johnson was at her front door.   He stated that she reported that Johnson was driving a silver Jeep.

{¶ 21} At the conclusion of the State's evidence, Johnson's attorney moved for an acquittal, and the court overruled the motion.

{¶ 22} Johnson testified that he lived "a couple of streets over" from Jennifer and that he had been in her house several times dropping off the children and picking them up.   He stated that at 8:00 a.m. on the day of the incident, he "called first like I usually do and drove over there to pick up a flash drive to copy the family videos that was court ordered."   Johnson stated that he was surprised when Jennifer told him that she had already dropped off the flash drive at his mailbox, so he told her that he would be back later that day with the videos, then left and went to his house to copy the videos.

{¶ 23} Johnson stated that he subsequently drove back over to Jennifer's house. As he approached, he looked in the backyard and noticed that no one was there, so he "parked outside and proceeded to the front door."   Johnson testified that he assumed they were home because both cars were in the driveway, and Jennifer knew he was coming back.   He stated that the overhead garage door was open and that he went to the front door and rang the doorbell.   Johnson stated that several minutes went by and that he was surprised when no one answered.

{¶ 24} Johnson stated that he decided to go home, but that as he walked down the sidewalk by the garage door, he decided to knock on the door in the garage.   He stated

that he found the door ajar and "not actually latched"; when no one answered his calls, he "pushed the door" with his hand.

{¶ 25} Johnson stated that the dogs had been locked in their "kennel area," and he was concerned that no one answered his calls. He proceeded to the front door area where the stairs were and thought he heard a noise, so he proceeded up the stairs. Johnson saw Lauren coming out of the shower in Jennifer's room and asked where her mother was; Lauren responded that she did not know. Johnson testified that he was surprised that Lauren did not know where Jennifer was and that Lauren did not tell him Jennifer was in the backyard. Johnson was "a little angry" that Lauren, who was eight years old at the time, had been left alone. He said Lauren also claimed to not know where her brother was.

{¶ 26} Johnson testified that he decided to go look for Jennifer, and he told Lauren to go downstairs and close the garage door. He stated that Lauren did not want to do so, and that he yelled at her to close the door because she had been by herself and both garage doors had been open. Johnson stated that, when he left, the overhead garage door was closed; he drove around the neighborhood looking for Jennifer, thinking she might be on a walk, then returned to the home 30 minutes later. According to Johnson, Jennifer was "kind of notorious for leaving our kids alone sometimes."

{¶ 27} Johnson testified that, upon his return, he went to the front door to "confront" Jennifer about this, and he also had the flash drive. He stated that Jennifer slammed the door upon opening it, that he rang the doorbell and jingled the handle in an attempt to get her to talk to him, and that she refused to open the door.

{¶ 28} Johnson acknowledged that, when he was interviewed by Kraker about the

incident, he was not truthful. He testified that he had been "scared" and was "freaked out by the whole incident." Johnson had told Kraker that his daughter let him in and gave him permission to enter, because he was concerned about the consequences of a possible felony conviction.

{¶ 29} On cross-examination, Johnson admitted that he had gone into the home without permission. He stated that, after he knocked on the interior garage door, "and it opened, I then did push on it, yes." He stated that he never touched the door handle on the door. Johnson testified that he had reason to enter the home once he noticed that the door was "open and ajar" because he was "worried for the safety of [his] family." Johnson acknowledged that Lauren had not been mistaken when she stated that she found him in Jennifer's bedroom after she got out of the shower. Johnson admitted being convicted of making false alarms in June 2019.

{¶ 30} At the conclusion of the evidence, Johnson's attorney requested an instruction on the lesser included offense of criminal trespass, a fourth-degree misdemeanor. The State objected, and the court denied the request. The jury found Johnson guilty of the charged offense.

{¶ 31} At disposition, after the court reviewed Johnson's criminal history, the State noted that, at the time Johnson committed trespass in a habitation of Jennifer's house, he was on probation and "specifically under an order * * * to have no future violations of law." The court then imposed sentence as described above.

{¶ 32} On appeal, Johnson raises the following assignment of error:

> THE TRIAL COURT ERRED IN CONVICTING APPELLANT OF
> TRESPASS IN A HABITATION BECAUSE SUCH CONVICTION WAS,

AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 33} Johnson asserts that, although he did not have permission to be in the residence on November 24, 2019, the facts presented supported the conclusion that he entered the residence pursuant to the privilege of necessity. After getting no answer at the door, he saw the garage door and the door inside the garage that led into the house open. He called out and no one answered, and he was worried for the safety of his family. Johnson also points out that no one was injured as a result of his actions, no damage occurred, and he immediately left the residence after talking to his daughter, asking her to close the garage door because he believed she was home alone.

{¶ 34} The State responds that there was no evidence that the jury lost its way and created a manifest miscarriage of justice. The State asserts that it offered evidence that there was no emergency which would have created a privilege for Johnson to enter the home of his ex-wife without permission; his children were not in danger and his daughter had not been left home alone.

{¶ 35} The following is well-settled:

"When evaluating whether a conviction is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *State v. Hunt*, 2d Dist. Greene No. 2013-CA-79, 2014-Ohio-3839, ¶ 14, quoting *State v. Thompkins,* 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *State*

*v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

> "The credibility of the witnesses and the weight to be given to their testimony are matters for the trier of facts to resolve." *State v. Hammad*, 2d Dist. Montgomery No. 26057, 2014-Ohio-3638, ¶ 13, citing *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967). Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997). "This court will not substitute its judgment for that of the trier of fac[t] on the issue of witness credibility unless it is patently apparent that the factfinder lost its way." (Citation omitted.) *State v. Bradley*, 2d Dist. Champaign No. 97-CA-03, 1997 WL 691510, *4 (Oct. 24, 1997).

*State v. Almeyda*, 2d Dist. Montgomery No. 28734, 2021-Ohio-451, ¶ 9-10.

{¶ 36} R.C. 2911.12(B) provides: "No person, by force, stealth, or deception, shall trespass in a permanent or temporary habitation of any person when any person other than an accomplice of the offender is present or likely to be present." In instructing the jury, the court defined "force" as follows:

> [F]orce means any violence, compulsion, effort, or constraint used by any means upon or against a person or thing to gain entrance. Force may be satisfied by any effort physically exerted. Opening a closed but unlocked door amounts to sufficient force to prove the element of force.

The court further instructed the jury that "trespass means, without privilege to do so, [to]

knowingly enter or remain on the land or premises of another." The jury was instructed that "[p]rivilege means an immunity, license, or right conferred by law, bestowed by express or implied grant, or rising out of status, position, office, or relationship, or growing out of necessity." Finally, the court instructed the jury that "[a] person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or is aware that his conduct will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist."

{¶ 37} Having reviewed the entire record, we cannot conclude that the jury lost its way and created a manifest injustice such that a new trial is warranted. In other words, Johnson's conviction was not against the manifest weight of the evidence. The jury clearly credited the testimony of Lauren, Aidan, and Jennifer over the testimony of Johnson, and we defer to the jury's assessment of credibility. As noted above, Lauren stated that she and her family were in their backyard together until she went inside to take a shower. She also testified that the overhead garage door was open for access to the garage because her brother and mother remained in the yard, and that she fully closed the door from the garage into the home when she entered. Lauren testified that, after her shower, she discovered Johnson in Jennifer's bedroom.

{¶ 38} We further note that Lauren's and Aidan's versions of events did not change in the course of their initial statements to responding officers, their forensic interviews, and the trial. Jennifer's version of events was also consistent with Lauren's and Aidan's, while Johnson's two versions of the events were inconsistent. The jury was free to conclude that both of Johnson's versions of events were merely self-serving, since Johnson admittedly lied to Kraker about being let into the home by Lauren out fear of a

felony conviction, and then changed his story to conform to the evidence adduced by the State at trial. In other words, instead of claiming to be invited in, which was not credible in light of the State's evidence, Johnson testified that Lauren discovered him in Jennifer's bedroom because he entered the home due to his concern for the safety of his children. The jury clearly rejected Johnson's testimony.

{¶ 39} Lauren also testified that, at time of the trespass, she had not seen Johnson in a year and half; Aidan testified that he had not seen Johnson in a year. Jennifer repeatedly made clear that Johnson was not welcome in her home. The jury was free to discredit Johnson's testimony that he had "been in the house several times dropping off the children and picking them up" or any suggestion by him that he had some kind of usual practice for calling Jennifer, looking for her and his children in the back yard, or visiting the home, thereby justifying his alarm when no one answered the door. Finally, in crediting Lauren's testimony, the jury was free to conclude that Johnson used force to open the closed, but unlocked, interior door and accordingly trespassed in the home.

{¶ 40} For the foregoing reasons, Johnson's assignment of error is overruled.

{¶ 41} The judgment of the trial court is affirmed.

. . . . . . . . . . . . .

HALL, J. and EPLEY, J., concur.

Copies sent to:

Marcy A. Vonderwell
P.J. Conboy
Hon. Michael A. Buckwalter